BOSTON & M. R. CO. v. McDUFFEY et al.

(Circuit Court of Appeals, Second Circuit. April 8, 1897.)

1. CONFLICT OF LAWS—DEATH BY NEGLIGENCE.
    A right of action given by the statutes of Canada to the widow and children of one who has been killed in that country through the negligence of another may be prosecuted to judgment by them in the courts of Vermont, though the corresponding statute of that state gives the right of action to the personal representatives of the deceased. Dennick v. Railroad Co., 103 U. S. 11, followed.

2. SAME—MASTER AND SERVANT—FELLOW SERVANTS.
    In an action to recover damages for death or injury resulting from defendant's negligence, the application of the rule as to the responsibility of the master for the acts of fellow servants is governed by the law of the place where the cause of action arose, not by that of the place where suit is brought, although the contract which created the relation of master and servant between the plaintiff and defendant was made in the latter place.

3. MASTER AND SERVANT—CONTRIBUTORY NEGLIGENCE—PROVINCE OF JURY.
    Upon an examination of the evidence, held, that the question of the contributory negligence of the plaintiff in this case, a locomotive engineer, in running his train, without a flagman, towards a point where he was likely to meet another train, was properly left to the jury.

4. TRIAL.—REQUESTS FOR INSTRUCTIONS.

 A court is not bound to instruct the jury in the precise language of counsel's requests, if the points suggested in such requests are otherwise covered in the charge.

5. SAME—PROVINCE OF COURT AND JURY.

 It is error to submit to a jury an issue as to which there is no evidence on which to base a finding, and the submission of which is an invitation to the jury to guess without proof, especially when the jury is thereby given an opportunity to follow a possible bias against one party.

In Error to the Circuit Court of the United States for the District of Vermont.

This case comes here on writ of error to review a judgment of the circuit court, district of Vermont, rendered in favor of defendants in error, who were plaintiffs below, upon the verdict of a jury for $5,850, damages, against plaintiff in error, defendant below. The plaintiffs are the wife and children of James B. McDuffey, a locomotive engineer in the employ of defendant, who, while on his engine, was killed by collision with another train of the defendant, at Capleton, in the Dominion of Canada. The facts pertinent to this writ of error will be found set forth in the opinion.

Stephen C. Shurtliff and John Young, for plaintiff in error.

C. A. Proutz, for defendants in error.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

LACOMBE, Circuit Judge. The defendant, a Massachusetts corporation, operated a continuous line of railroad from White River Junction, in Vermont, to Sherbrooke, in the province of Quebec. McDuffey was a citizen of Vermont, resident at Lyndonville, in that state, where he entered into the employment of defendant, at first as fireman, afterwards as engineer. For about three years he drove the engine of a freight train between points wholly in the state of Vermont. In July, 1892, he was, at his own request, employed to drive an engine drawing a passenger train between White River Junction, Lyndonville, and Sherbrooke. It was while thus employed that he met his death, on March 12, 1894. It was contended that defendant had failed to supply reasonably safe appliances, in that a water tank on the tender was insecurely fastened, but the jury to whom special questions were submitted found against the plaintiffs on that issue. The jury further found that two of McDuffey's fellow servants, viz. Robinson, the conductor of his train, and Mower, the engineer of the colliding train, were negligent, and that such negligence caused the catastrophe.

It is contended that this action cannot be maintained by the plaintiffs, but should have been brought by the executor or administrator of the deceased. The Statutes of Vermont (section 2452) provide that such action shall be brought "in the name of the personal representative of the deceased." The Civil Code of Lower Canada (article 1056) provides as follows:

"In all cases where the person injured by the commission of an offence or a quasi offence, dies in consequence, without having obtained indemnity or satisfaction, his consort and his ascendant and descendant relations have a right, but only within a year after his death to recover from the person who committed the offence, or quasi offence, * * * all damages occasioned by such death."

This objection seems to be disposed of by decisions of the supreme court. In Dennick v. Railroad Co., 103 U. S. 11, that court says of a similar action:

"It is, indeed, a right dependent solely on the statute of the state; but when the act is done for which the law says the person shall be liable, and the action by which the remedy is to be enforced is a personal, and not a real, action, and is of that character which the law recognizes as transitory, and not local, we cannot see why the defendant may not be held liable in any court to whose jurisdiction he can be subjected by personal process or by voluntary appearance. Wherever, by either the common law or the statute law of a state, a right of action has become' fixed, and a legal liability incurred, that liability may be enforced, and the right of action pursued, in any court which has jurisdiction of such matters and can obtain jurisdiction of the parties."

Necessarily, the right of action is to be pursued by the party in whose favor it has become fixed; and in the case at bar it became fixed in favor of the "consort and relations," under the Canadian statute, by the killing of McDuffey in Canadian territory, under circumstances which made defendant civilly liable for damages to such "consort and relations." It is such right of action that plaintiffs seek to enforce, not a right of action growing out of any Vermont statute.

The case last cited was approved in Railway Co. v. Cox, 145 U. S. 593, 12 Sup. Ct. 905. In that case an injury causing death was inflicted in the state of Louisiana, upon one Cox, a freight conductor, in the employ of the railroad, the accident happening by reason of a defective roadbed. His widow brought suit in Texas, under the Louisiana statute. The court says:

"The rule [laid down in Dennick v. Railroad Co., 103 U. S. 11] is generally recognized and applied where the statute of the state in which the cause of action arose is not in substance inconsistent with the statutes or public policy of the state in which the right of action is sought to be enforced. The statutes of these two states are not essentially dissimilar, and it cannot be successfully asserted that the maintenance of jurisdiction is opposed to a settled public policy of the state of Texas."

It certainly cannot be said that the statute of Canada is "in substance inconsistent with the statute" of Vermont, which also provides that for negligence causing death the offender shall respond in damages as he would have to do had death not ensued; nor are the statutes "essentially dissimilar" when the one provides that such damages shall be collected by an executor or administrator who shall thereafter distribute the same to the persons who under the other statute may bring suit directly. To this effect is Wooden v. Railroad Co., 126 N. Y. 10, 26 N. E. 1050.

It is not disputed that Robinson and Mower were fellow servants with McDuffey. Had this accident occurred in Vermont, and McDuffey survived, the fact that the negligence which caused the collision was, as the jury has found, that of a fellow servant, would have prevented recovery.

The law of Canada was proved as a fact in the circuit court. Besides article 1056, already quoted, the following articles from the Civil Code were read:

"Art. 1053. Every person capable of discerning right from wrong is responsible for the damage caused by his fault to another, whether by positive act, imprudence, neglect or want of skill.

"Art. 1054. He is responsible not only for the damage caused by his own fault, but also for that caused by the fault of persons under his control, and by things which he has under his care. * * * Masters and employers are responsible for the damage caused by their servants and workmen in the performance of the work in which they are employed."

The expert called for plaintiffs testified without contradiction that, as construed by the Canadian courts, these articles applied to corporations, and that, where an accident causing injury to a servant was the result of the negligence of a fellow servant, the employer would nevertheless be liable in damages to the injured person, and, in the event of his death within the time prescribed, to the persons to whom article 1056 gave the right of recovery. It is contended by plaintiff in error, however, that the law of Vermont is to be applied here, and that since it appears from the special verdict that the efficient cause of the accident was the negligence of a fellow servant, plaintiffs cannot recover. In other words, does the law of Canada or the law of Vermont determine the question of liability for the consequence of this accident?

This is not an action to recover upon a contract, but for damages resulting from a tort committed elsewhere than in the state where the action is brought. The right of action accrued where the tort was committed, and it is to enforce such right of action that suit is brought. It is sufficient to refer to Railroad Co. v. Babcock, 154 U. S. 190, 14 Sup. Ct. 978 (citing, with approval, Herrick v. Railroad Co., 31 Minn. 11, 16 N. W. 413), as authority for the proposition that "in such cases the law of the place where the right was acquired or the liability was incurred will govern as to the right of action; while all that pertains merely to the remedy will be controlled by the law of the state where the action is brought. And we think the principle is the same whether the right of action be ex contractu or ex delicto." The question whether or not an injured servant shall have a right of action for damages against a negligent master, when such master's negligence has been committed through the instrumentality of another servant, is one which deals with the right of action itself, not with the remedy. In our opinion, it makes no difference that the contract by which the relation of master and servant was established was made in Vermont. Conceding that it is to be assumed that, under such contract of employment, McDuffey assumed the risks incident to the negligence of his fellow servants on so much of his run as lay within that state, where such negligence gives no right of recovery for resulting injuries or death, it does not follow that he agreed thereby to assume like risks when running his engine in Canada, where the statutes gave a right of recovery therefor. The answer to the forcible argument of counsel for plaintiff in error based upon the language of the supreme court in Railroad Co. v. Baugh, 149 U. S. 368, 13 Sup. Ct. 914, is that in the case at bar we are dealing, not with general law, but with statutory enactments.

The next point to be considered is as to the alleged contributory negligence of McDuffey. It is conceded that the law of Canada is the same as the law of Vermont in this particular, and that, if

the accident happened by McDuffey's fault in whole or in part, plaintiffs would not be entitled to recover, unless it should appear that after such fault had placed him in a position of danger, which defendant's servants saw or should have seen, they failed to take some proper precautions, which, if taken, would have avoided the accident. The questions arising upon this branch of the case are presented—First, by exception to a refusal to direct a verdict for the defendant; second, by exception to a refusal to charge certain requests; and, third, by exceptions to portions of the charge. To a proper understanding of the points raised by these exceptions, it will be necessary to set forth the material facts in proof.

The railroad is a single-track one, with sidings at the different stations. By the use of these sidings, only, can trains pass each other. The siding at Capleton lies to the west of the main line, with which it connects by switches at the north and south ends of the yard. The north-end switch is about 650 feet north of the station. The south-end switch is about 1,213 feet south of the station. The frog of the south-end switch (which is the point of intersection of the easterly rail of the siding with the westerly rail of the main line) is 63 feet north of the switch. The place on the main line on which a train could stand with safety while another train was running from the main line onto the siding through the south-end switch lies about 40 feet further north than the frog. There were no fixed signals at Capleton. McDuffey, the deceased, was running a south-bound train, of which Robinson was the conductor, and Mower, as engineer, was running a north-bound train. Both trains were of the same class,—regular passenger trains. These trains were, under special orders in writing duly delivered to the conductors and engineers, to meet and pass at Capleton, and McDuffey's train reached that station first.

Numerous printed rules of the railroad in force at the time were read in evidence. So much of these rules as is material to the questions now to be discussed is here given:

"Rule 9. * * * Outward trains are * * * north-bound trains; inward trains are * * * south-bound trains."

"Rule 16. In the absence of special orders, regular inward trains will wait at designated meeting places indefinitely for a delayed outward train of same or superior class. No regular train will leave a terminal station, or pass a station that is a terminal for another train of same or superior class, until all such trains that are due or overdue have arrived.

"Rule 17. No train will leave a station expecting to meet or to be passed at the next station by a train having the right of track, unless it has ample time in which to make the meeting or passing point, and clear superior trains as per rules. All trains approaching stations not protected by fixed signals, where they expect to meet or pass other trains, must be under full control, so that, if signaled, they may be stopped.

"Rule 18. When trains of the same class are to meet, the inward train will take the siding unless otherwise ordered."

"Rule 43. Conductors and enginemen will be held equally responsible for the violation of any of the rules governing the safety of their train. They must take every precaution for the protection of their trains, even if not provided for by the rules."

"Rule 71. He [referring to conductor] will have entire charge of the train while on the road, and will make its safety his first care. He is responsible

fo¥ its movements, but when there is any doubt as to the right of road. or safety of proceeding, from any cause, he will consult the enginemen, who will be equally responsible for the safety of the train."

"Rule 277. Special orders in regard to the movements of trains must be made in writing, addressed to the conductor and enginemen in charge of the same, and must be taken on manifold paper. Never take verbal orders for the movement of trains or engines."

"Orders must be made plain and explicit, and, if not fully and completely understood by the parties addressed, an explanation must be required before taking the order. After the reception of an order, it must be obeyed fully and to the letter. Conductors and enginemen must not accept an erased, altered, or interlined order. They must make sure that they are meeting the trains and engines specified in their train orders at meeting and passing points."

"Rule 350. At stations where a passenger train is expected, freight trains must stand on a side track if possible. When they cannot do so, the conductor of such trains will post a flagman a sufficient distance from his train towards the expected train to prevent the possibility of a collision. The same rule will apply at all meeting places of all trains, when one train is obliged to proceed towards the further end of the station yard for the purpose of setting off before the arrival of the other train. ["Setting off" means running from the main track, through the switch, onto the siding.] It must be remembered that the right of road at meeting places does not extend beyond the nearest switch. All trains approaching a station where they expect to meet or pass other trains must be under full control, so that they may, if necessary, be stopped before reaching the nearest switch, and will not pass the station at a greater speed than ten miles per hour."

When McDuffey's train stopped at Capleton, the conductor, Robinson, and himself, went into the station, and received a train order, which instructed them that trains "Nos. 11 & 18"—i. e. their own and Mower's—were to meet, and therefore to pass, at Capleton. After receipt of this order there was a conversation between them as to what should be done. The most natural course would have been to back up, and run onto the siding, or to "set off" through the north-end switch; but it appears that that end of the siding was blocked with freight cars, and that it would be the more convenient way to "set off" through the south-end switch. The result was that the train was moved southward beyond the station, with the intention, as the conductor testified, of operating the switch, and setting off the north-bound train onto the siding. The conductor further testified that this plan was suggested by McDuffey, but, upon the evidence, it was a fair question for the jury to say which one proposed it. At any rate, McDuffey understood that they were to move southward from the station. He went onto his engine, drew his train south on the main line, and kept it moving until collision, or until only an instant before. At that time his engine was about 10 feet north of the frog, and something over 70 feet north of the south-end switch. No one had as yet moved the switch to set off the north-bound train. No red light or signal preceded McDuffey's train, nor was any signal man posted a sufficient distance from his train towards the approaching train to prevent the possibility of collision; nor did Robinson, the conductor, take any steps to have this done. About 350 feet beyond the south-end switch the road took a sharp curve to the west, around a high knoll, which then obstructed the view of a train approaching from the south. Mower, the engineer of the north-bound train, shut off steam one-half mile south of the switch,

and before his train passed around the curve. As soon as his train rounded the curve, and came in sight of the south-bound train, he applied the air brakes, and reversed his engine. Nevertheless, his train drove on more than 70 feet beyond the switch, and collided with McDuffey's.

It will be noted that the setting off of the north-bound train, had it been accomplished, would have been in direct violation of rule 18. Robinson, the conductor, testified that "it is not considered that that rule is imperative." His theory apparently was that his train had the right to move south as far as the switch, carrying the flagman on the engine, and sending him forward after reaching the switch. It is unnecessary to enter into any discussion as to this part of the case. The jury has specifically found that Robinson was negligent, and we must accept that as an established fact, though it cannot be determined whether the jury thought that his negligence consisted in allowing the train to run south as far as it did, or in failing to keep his signal man far enough in advance to avoid collision. It is plain, however, that the question of McDuffey's negligence was one which was properly left to the jury, because, if they should find that the train might properly be moved southward from the station when effectually protected by a signal man far enough in advance (and we cannot see why that may not have been a perfectly proper course when the north end of the siding was blocked), they might also find that it was primarily the duty of the conductor (rule 350), and not of McDuffey, to send forward the flagman; and the only question would then be whether McDuffey was reasonably prudent, under all the circumstances, in relying on Robinson to attend to that, and in going forward upon the assumption that it had been done. If, therefore, the jury had found specifically that McDuffey was not guilty of any negligence which contributed to the accident, there would be no difficulty in sustaining such finding. But they have not done so. Specific questions were put to them touching the sufficiency of the fastenings of the water tank, the negligence of Robinson, and the negligence of Mower; but, most unfortunately, it does not seem to have occurred to any one to ask them specifically as to the alleged negligence of McDuffey. There are many cases in which it is eminently desirable to have the jury return special findings; but, when such cases arise, it will generally be found useful to have them return specially as to all the controlling issues of fact in the case, since it is not always certain that their general verdict will indicate the process by which it is arrived at. This review of the facts, however, shows that the exception to the refusal of the court to direct a verdict in favor of defendant on the ground of McDuffey's contributory negligence is unsound.

The defendant excepted to a refusal to charge the following requests:

"(4) That if the death was the result of the negligence of the deceased, either in whole or in part, the plaintiffs cannot recover.

"(5) That if the death was the result of the negligence of a co-employé of

the deceased, in which negligence the deceased knowingly participated, the plaintiffs cannot recover.

"(6) That if the death was caused by the negligence of Robinson in not sending a lookout ahead to signal the north-bound train, and stop it, or turn it upon the side track at the south end of the yard, and the deceased voluntarily consented to take the south-bound train to the south end of the yard, knowing that no one had been sent south to signal the approaching train coming north, that the question of the defendant's liability does not arise.

"(7) That any act which caused the death, and was voluntarily consented to or participated in by the deceased, with a full knowledge of the peril, is not a basis of recovery by the plaintiffs."

The court was under no obligation to follow the language of these requests. That every point suggested by them was fully covered, the following excerpts from the charge sufficiently show:

"Was [Robinson] in fault in going down there without a flagman ahead, and if so, did McDuffey concur in going down there without a flagman ahead? If he did, why then McDuffey would have no grounds to complain if he went down there and was hurt. * * * Look at it, and say * * * whether McDuffey concurred, agreed to it, went along understanding that there was no flagman there. If he did, there would be no grounds of recovery by the plaintiffs; but if * * * you find McDuffey did not know there was not any flagman ahead, but went on supposing there was one, and was not careless, then plaintiffs would have a right to recover."

And elsewhere the court charged that, if McDuffey's "own fault either in whole or in part [caused his death], he is not entitled to recover," with a qualification which belongs to another branch of the case, and will be subsequently considered. The exceptions to refusal to charge as requested are therefore unsound.

Defendant separately excepted to the court's instructions to the jury that "plaintiffs could recover although McDuffey drew his train south of the station to the place of accident wrongfully, and concurred in the wrongful act of drawing it there without a signal in front of it"; and that "if McDuffey was wrongfully at the place of the accident, and Mower was guilty of negligence, defendant was liable." While these exceptions do not give the precise text of the charge, they sufficiently indicate the parts objected to, and bring up the question as to Mower's negligence. As we have seen, the jury has specifically found him negligent, and there was sufficient evidence to warrant such finding. Rule 350 made the south switch the terminus of his right of way, and required him to approach the station with his train under such control that it could, if necessary, be stopped before reaching the switch. The necessity of stopping became apparent to him as soon as he rounded the curve, so as to sight the south-bound train; but he was evidently unable to stop until he had run 70 feet or more beyond the switch. He seems, from his evidence, to have supposed his right of way ran to the station. Upon the proof, the jury might fairly find that he was negligent in not approaching the station with his train sufficiently under control; that he had not reduced speed sufficiently before he came to the curve, and, rounding it, learned that it was necessary to stop short of the switch. But such negligence on his part would not deprive the defendant of whatever defense it might have arising from McDuffey's own negligence. To lose the benefit of such defense, it must appear that

a defendant has been guilty of some negligence subsequent to the time when he knew or ought to have known that the other's negligence had created a position of peril. Coasting Co. v. Tolson, 139 U. S. 557, 11 Sup. Ct. 653; Railroad Co. v. Ives, 144 U. S. 408, 12 Sup. Ct. 679. "It is only when the negligence of one party is subsequent to that of the other that the rule can be invoked. When the negligence of the two parties is concurrent at the time of the injury, it makes no difference that one discovered the negligence of the other before the catastrophe, but too late to prevent it." 4 Am. & Eng. Enc. Law, p. 30.

The court charged the jury that one question they would have to answer was: "Supposing McDuffey's train was there wrongfully, with his concurrence, could Mower, by the exercise of the diligence required of him, have prevented running into it? * * * After he had looked or was bound to look, could he, if he had exercised ordinary prudence required under such circumstances, have prevented running into this train?" And, elsewhere, that, if the accident was in whole or in part McDuffey's fault, there could be no recovery, "unless Mower's fault did it, and did it after Mower knew of the train being in the wrong place, or might have known by observing." Upon this branch of the case the court charged at considerable length, and there are expressions used which plaintiff in error contends were calculated to lead the jury to suppose that they might find such negligence in Mower as would eliminate any possible defense of contributory negligence, if he rounded the curve at such a high rate of speed that he could not control his train after the danger was apparent, and before the switch was reached. It is not necessary to examine the language of the charge to see whether there is any force in this contention, since it is manifest that the jury were given to understand that there was evidence in the case from which they might find that Mower had been guilty of some negligence after the danger was apparent. The record submitted here, however, negatives any such hypothesis. It is expressly stated in the bill of exceptions, as certified by the judge who tried the cause, that:

"The testimony on behalf of the railroad tended to show, and was not contradicted, that the engineer, Mower, of the north-bound train, shut off the steam one-half mile south of the switch at the south end of the said yard, and before his train passed round said curve, into sight of the station at said Capleton or said south switch; and as soon as his engine came round said curve, and in sight of the south-bound train driven by said McDuffey, said Mower applied the air brakes to the wheels, and reversed his engine, and did all that could be done to stop his train. There was no evidence offered tending to show that anything more could have been done to stop the north-bound train after the south-bound train was discovered, by said engineer, Mower, or his fireman, Fowler, or that either could have discovered the south-bound train quicker than they did in fact discover it."

In view of this state of the proof, it was error to submit to the jury any question as to whether they thought Mower was negligent after he could have seen the other train, there being, so far as the record shows, not a scintilla of proof on which to base a finding that he was thus negligent. It was an invitation to the jury to guess without proof; and, in view of their usual bias in

cases of this kind, it would not be surprising if they guessed against the defendant. The case in that respect is quite similar to Railroad Co. v. Blessing, 14 C. C. A. 394, 67 Fed. 277, in which we pointed out the impropriety of instructing the jury upon assumed facts to which no evidence applies.

If we were able to determine in any way that the jury reached the conclusion that McDuffey was not negligent, this verdict might be sustained. Thus, if they had found Robinson free from fault, it would be manifest that they must have reached the same conclusion as to McDuffey. But they have found that Robinson was negligent, and we cannot tell whether they gave plaintiffs a verdict because they thought McDuffey did not participate in that negligence, or because, finding McDuffey negligent, they nevertheless guessed (as they were practically told they might do) that Mower might have done something to avoid the catastrophe. Under these circumstances, there seems nothing to do but reverse the judgment, and remand the cause for a new trial.