A. G. YOUNG, Administrator of Estate of PANSEY MIDDLETON, v. ST. LOUIS, IRON MOUNTAIN & SOUTHERN RAILWAY COMPANY, Appellant.

Division One, March 31, 1910.

1. **NEGLIGENCE: Killing Person: Damages "As Penalty."** The amendment of 1905 to Sec. 2864, R. S. 1899, providing that in case of the negligent killing of a person, the corporation "shall forfeit and pay as a penalty, for every such person, employee or passenger so dying, the sum of not less than two thousand and not exceeding ten thousand dollars, in the discretion of the jury," is a penal statute. The words "as a penalty" add nothing to the meaning or effect of the section as it was prior to the amendment. The section has always been held to be a penal statute.

2. ————: ————: ————: **Fixed by Jury: Constitutionality.** The governmental function of declaring an act a crime or other offense against the law, to which a penalty may be affixed, can be exercised only by the legislative department, and cannot be delegated; but the said amendment of 1905 to said section 2864, placing a minimum and a maximum limit to the amount of the penalty, and permitting the jury to fix the damages at any amount between those limits, in its discretion, was not a delegation of a legislative function, and is not unconstitutional. It simply permits the jury, within limits, to adjust the penalty to the circumstances of different cases.

3. ———: **Right to Clear Track: Actually Seeing Inspector.** Where the engineer and fireman were entitled to a clear track and were not chargeable with the duty of being on the lookout for the inspector on the track, defendant is liable for his death, only if they actually saw him in time to have averted the accident under the conditions and with the means at hand.

4. ———: ———: ———: **Evidence of Both Sides.** Where there was no testimony on plaintiff's part as to when defendant's engineer and fireman first saw the peril of deceased on the track, but they testified that they saw him at a certain point, and there is other evidence on the part of plaintiff that the train could, by the exercise of reasonable care, have been stopped between the place where they said they saw him and the point of accident, the issue becomes one for the jury, under the humanitarian doctrine, though deceased was guilty of contributory negligence. And in such case the jury are not bound to accept the statement of the engineer and fireman that when they first saw deceased, he jumped off of his velocipede, ran down the embankment, stopped, turned back and attempted to remove the machine from the track, and while doing so was struck. That testimony, if true, would exculpate defendant, but the jury are not bound to believe it, although no verdict could stand unless the jury believed the other part of their story as to when they first actually saw deceased.

5. ———: **Contributory: Not Involved: Instruction: Humanitarian Theory.** Where the evidence shows deceased track inspector was negligent, an instruction which assumes, or at least authorizes the jury to find, that he was at the time of the accident on the track in the due performance of his duties, from which an inference might improperly be drawn that he was where his duty called him and was not therefore negligent, is misleading. It brings into the case a matter which should not be considered by the jury. But if that were the only error it would not be reversible.

6. ———: **Unaware of Peril.** The instruction should not assume that the engineer, when he saw deceased on the track, knew he was unaware of his peril.

7. ———: **Sounding Whistle.** Where deceased was on a bridge when he was first seen by the engineer, it is error to permit a recovery based on a failure to sound the whistle, when it is apparent that the only way to avoid the accident was to stop the train.

8. ———: **Humanitarian Doctrine: Instruction: Except for Wanton, etc.** Defendant's instruction that there can be no recovery unless the conduct of its servants was "wanton, wilful and

reckless," in a case based upon the humanitarian doctrine, should be refused. The law recognizes no degrees of negligence. The damages recoverable are not compensatory, but entirely penal, and in fixing the penalty the jury have a right to consider the conduct of the negligent party beyond the mere finding that he was negligent; they may consider whether the conduct which resulted in the accident arose from mere inattention, or was wilful, wanton or reckless, but, whatever its character, if it was negligent, plaintiff is not barred a recovery simply because that conduct was not wanton, etc.

Appeal from Jasper Circuit Court.—*Hon. Hugh Dabbs,* Judge.

REVERSED AND REMANDED.

*M. L. Clardy* and *Edw. J. White* for appellant.

(1) Section 2864 of the Damage Act, as amended in Laws 1905, pp. 136-7, is unconstitutional, because in actions against railroad companies it delegates to the jury the fixing of a penalty, on a sliding scale, at any sum from $2000 to $10,000, within their discretion, without furnishing any lawful basis for such discretion. It delegates to the jury a legislative or judicial function and furnishes a special unreasonable basis of recovery as against railroads, thus denying them the equal protection and benefit of the laws, in violation of Sec. 30, Art. 2, of the Missouri Constitution, and of the Fourteenth Amendment to the Federal Constitution. Railroad v. Railroad Com., 16 Am. & Eng. R. Cas. 14; Cigar Makers' Union v. Goldberg, 61 Atl. 457; Railroad v. Reed, 158 Ind. 25; Schroeder v. Railroad, 41 Ia. 344, 47 Ia. 375; Railroad v. Pontius, 52 Kas. 264; Johnson v. Railroad, 43 Minn. 222; Howard v. Railroad, 207 U. S. 492; Connolly v. Union Pipe Co., 184 U. S. 540. (2). (a) Plaintiff's cause rested alone on conjecture at the close of her evidence, as none of her witnesses saw the deceased at time of the collision, or knew what he was doing, and as no presumption of negligence could be indulged in, under

the circumstances, no cause was made.  Smith v. Railroad, 113 Mo. 70; Howard v. Railroad, 173 Mo. 524; McGrath v. Transit Co., 197 Mo. 97.  (b)  The evidence of the plaintiff shows that the deceased, with knowledge of the train which would pass him at that point, voluntarily got upon the track, upon a conveyance he could not easily remove, and continued to ride with his back toward the train he knew was approaching, without looking back; he was, therefore, guilty of such contributory negligence as prevented a recovery for his death.  2 Thompson on Neg., secs. 1768, 1769, 1778.  (c)  The evidence of plaintiff's witness, Oehler, who saw the deceased just before the collision, being to the effect that he never looked back for the train or stopped to listen, after getting on the velocipede, as long as he was within his vision, showed that his negligence continued down to the time of the accident and was contemporaneous therewith.  The last-chance doctrine could not apply, and this negligence prevented a recovery.  Holwerson v. Railroad, 157 Mo. 221; Mulloy v. Railroad, 84 Mo. 270.  (d)  The petition being based upon the "willfulness and wantonness" of the injury, and the evidence failing to show that the employees in charge of the engine saw the deceased in time to avoid the accident by reasonable care, even, there was a failure of proof of the cause of action set up.  Raming v. Railroad, 157 Mo. 507; Behen v. Railroad, 186 Mo. 439; Owens v. Railroad, 95 Mo. 180; O'Brien v. Transit Co., 212 Mo. 67.  (3)  (a)  The first instruction for plaintiff, in predicating a recovery "if the deceased was engaged in the line of his duty, inspecting said track, on said speeder," authorized a recovery on a theory on which there was not only a total absence of evidence but which was in the face of all the evidence in the record on this phase of the case, thus changing the status of the deceased from that of a trespasser to that of an employee rightfully located in a dangerous place.  (b)  The first instruction also

based a right of recovery upon the failure of the engineer to use the appliances at hand to stop the train. This was directly in the face of the undisputed evidence in the cause, as the evidence was to the effect that he used all the appliances vigilantly and skillfully from the very instant that deceased appeared to him on the track. That this assumption of such a material fact in issue in the cause was reversible error, is squarely held in this State. Williams v. Railroad, 96 Mo. 275. (c) The first instruction also abandoned the idea of "wantonness or willfulness" in striking the deceased and predicated a liability on the mere fact of negligently striking him, thus abandoning the theory of a liability under which the petition proceeded in setting up the cause of action. To plead an assault and prove a negligent injury is held to be a departure, in this State. Raming v. Railroad, 157 Mo. 507; Behen v. Transit Co., 186 Mo. 439. (d) And by the fifth instruction for plaintiff the jury were told to assess the damages at any sum between two and ten thousand dollars, although the evidence showed no facts at all as a basis for any pecuniary recovery, other than the death of the deceased. If the Damage Act, as amended in 1905, can be upheld at all, it is penal to the extent of the $2000 fixed by the Legislature and compensatory between this sum and the maximum recovery, and without some evidence as a basis for a pecuniary recovery the minimum recovery alone can be had. Coover v. Moore, 31 Mo. 574; Philpott v. Railroad, 85 Mo. 168; Carroll v. Railroad, 88 Mo. 247; Casey v. Railroad, 116 Mo. App. 235, 205 Mo. 721. An instruction on damages, leaving it to the unbridled discretion of the jury to assess damages, without legal basis for the computation, or without any elements for the assessment thereof—whether the damages are compensatory or exemplary—has always been held to be error, in this State, prior to the enactment of this statute. Hawes v. Stockyards Co., 103 Mo. 66; Goss v.

Railroad, 50 Mo. App. 623; McGowan v. Ore Co., 109 Mo. 518. (4) As the evidence for the plaintiff showed nothing at all on which to base a pecuniary recovery, the court should have given the instructions asked, limiting the recovery to the minimum amount under the statute. Goss v. Railroad, 50 Mo. App. 623; Mc-Gowan v. Ore Co., 109 Mo. 518; Schaub v. Railroad, 106 Mo. 74; 2 Sedgwick on Dam. (8 Ed.), sec. 577.

*John H. Flannigan, R. A. Mooneyham* and *R. M. Sheppard* for respondent.

(1) Section 2864 of the Damage Act, as amended by Laws 1905, pp. 136-7, is constitutional. It applies to every corporation or individual engaged in the business of a common carrier; it does not exempt any. Ex parte Handler, 176 Mo. 383; Eling v. Hickman, 172 Mo. 257; State ex rel. v. Woford, 121 Mo. 161; State ex rel. v. Yancey, 123 Mo. 381; Spaulding v. Brady, 128 Mo. 653; State ex rel. v. Higgins, 125 Mo. 364; O'Connor v. Transit Co., 198 Mo. 622; Taylor v. Transit Co., 198 Mo. 915; Coffey v. Carthage, 200 Mo. 616; McFarland v. Railroad, 175 Mo. 422; Humes v. Railroad, 82 Mo. 221; Carroll v. Railroad, 88 Mo. 246. (2) (a) At the close of the plaintiff's case the evidence showed that the engineer in charge of defendant's locomotive and train of cars saw the deceased when the train was a quarter of a mile from the spot where deceased was struck and killed; that at the time deceased was discovered by the engineer deceased was in a perilous position, that is to say, on a trestle and approaching a bridge where it was impossible for him to jump off the track; that deceased continued upon the speeder and from all indications was unaware of the approaching danger; that the engineer did not give any warning, sound the whistle, ring the bell, or apply the brakes, until an instant before his engine struck and killed the deceased; that if he had sounded his

whistle, given an alarm, or made use of the appliances he had at his command to stop his train when he first discovered the deceased, the fatal accident would have been prevented. The establishment of these facts was sufficient to submit this case to the jury. Lynch v. Railroad, 208 Mo. 1. (b) The negligence of the deceased did not license defendant's servants in charge of its train to kill him, when, by the exercise of ordinary care, after they discovered the deceased in his perilous position, they could have sounded the whistle, and stopped their train in time to avoid the collision. Lynch v. Railroad, 208 Mo. 1; Kelley v. Railroad, 101 Mo. 67. (c) The fact that deceased was guilty of contributory negligence would not bar a recovery if the engineer, after discovering deceased upon the track, might by the exercise of ordinary care have prevented the injury. Lynch v. Railroad, 208 Mo. 34; Eppstein v. Railroad, 197 Mo. 720; Hinzeman v. Railroad, 182 Mo. 611.; Morgan v. Railroad, 159 Mo. 262; Williamson v. Railroad, 139 Mo. App. 481. (d) Whether the evidence of the engineer was true as to what the deceased did just prior to the time he was struck, was a question of fact for the jury. (3) Plaintiff's first instruction is not subject to the criticism made by the appellant. This instruction was taken substantially from the instruction in the case of Morgan v. Railroad, 159 Mo. 262. (a) The evidence clearly shows that the deceased was engaged in the line of his duty and was inspecting the track; the fact that he was on a speeder instead of walking along the track would not show that he was not engaged in the line of his duty. (b) The next objection to this instruction is that the evidence showed that the engineer used all the appliances vigilantly and skillfully from the very instant that the deceased appeared to him on the track. To arrive at this conclusion all of the evidence of the plaintiff to the effect that no alarm was given and that the air was not applied until after

the engine had passed the bridge would have to be
ignored; that is to say, the court would have to discard
the evidence of four or five witnesses who are disin-
terested, and in their stead take the evidence of the
trainmen who are interested.   This fact was not as-
sumed in this instruction but the jury were required to
find that it was true before they could return a verdict
in favor of the plaintiff.   (c) The court did not err
in instructing the jury in the language of the statute
as to the amount of the penalty they should find in
favor of plaintiff, nor in refusing defendant's instruc-
tions which required the jury to limit the amount of
recovery to nominal damages only, and to two thousand
dollars.   R. S. 1899, sec. 2864, as amended by Laws
1905; Van Housen v. Riggs, 11 How. 461; Casey v.
Transit Co., 116 Mo. App. 247; Anderson's Law Dic-
tionary; 30 Cyc. 1335; State v. Sheppard, 192 Mo.
497; Railroad v. Sullivan, 59 Ala. 272; Railroad v.
Lansford, 42 C. C. A. 160; Railroad v. Shearer, 58
Ala. 672; Railroad v. Landers, 98 Ala. 293; Matthews
v. Warner, 26 Am. Rep. 396; Buckler v. Railroad, 112
Ala. 146; Railroad v. Burgess, 16 Ala. 509; Matthews
v. Warner, 29 Grant 507; Freuchey v. Aecleson, 43
N. E. 146; Thompson on Negligence, sec. 130; Wheeler
v. Boles, 163 Mo. 398; Gusman v. Elect. Co., 173 Mo.
654; Gamache v. Johnston Co., 116 Mo. App. 596;
Ashley v. Earley, 11 Mo. App. 79; Smith v. Fordyce,
190 Mo. 130; Potter v. Railroad, 136 Mo. App. 125;
29 Cyc. 1491.

VALLIANT, J.—This suit was instituted by
Pansey Middleton, in her lifetime, then a minor, suing
by her curator; she recovered a judgment for five
thousand dollars against the defendant for the death
of her father, whose death she alleged was caused by
the negligence of the servants of the defendant rail-
road company in operating one of its trains.   After
the cause was brought to this court by defendant's
appeal the plaintiff died and the cause was revived

here to be prosecuted in the name of A. G. Young, the administrator of her estate.

The petition states that the plaintiff's father was in the service of the Missouri Pacific Railway Company as a section hand; a part of his duties was to go over a section of the road at times and inspect its condition; that on the day in question he was passing over the road on a railroad velocipede, commonly called a speeder, when he was struck by an engine drawing a train of cars belonging to the defendant, the Iron Mountain Railway Company, and killed; that defendant company was running its train over the Missouri Pacific Company's track by license to do so. The statement of the cause of action is that the servants of the defendant company saw the deceased on the track, saw that he was unaware of the near approach of the train, and they then and there became aware of his perilous position in time to have prevented striking and injuring him by the exercise of ordinary care, by stopping or placing their train under control, or sounding the usual danger signals, but "negligently, wilfully and wantonly" failed to use the appliances at hand to stop or place the train under control or sound the danger signal, failed to ring the bell or sound the whistle, but ran the engine against the plaintiff's father and killed him. The prayer of the petition was that the defendant be adjudged to forfeit and pay the sum of ten thousand dollars and that plaintiff recover that sum and costs. The answer was a general denial and a plea of contributory negligence.

At the trial, when the plaintiff was about to begin to introduce her evidence, the defendant interposed an objection on the ground that the petition failed to state facts sufficient to constitute a cause of action, in that it was founded on the Act of the General Assembly entitled "An act to amend section 2864 of chapter 17 of the Revised Statutes of the State of Missouri, 1899,

entitled 'Damages and contributions in actions of tort,' ''. approved April 13, 1905, Laws 1905, p. 135, which act was unconstitutional because it was in contravention of section 30, article 2, of the Constitution of Missouri, and of the Fourteenth Amendment to the Constitution of the United States. The objection was overruled and exception saved. The same point was also subsequently made in instructions asked by defendant and refused, and also in the motion for a new trial.

I.  As the question of the constitutionality of the Act of 1905 reaches to the foundation of the case we will consider it before going into the facts of the case. We do not understand appellant to challenge the validity of section 2864 as it stood until amended by the Act of 1905, but the challenge is to the section as amended.

Section 2864, Revised Statutes 1899, has been so long in our statutes that its terms are familiar to every one and it need not be literally quoted here.  In general terms it provided that when a person should die from an injury received through the negligence of an officer, agent or servant engaged in running a locomotive, car, etc. (naming other transportation vehicles), the corporation or person owning the vehicle ''shall forfeit and pay for every person or passenger so dying, the sum of five thousand dollars, which may be sued for,'' etc.  The Act of 1905 made several amendments to that section, but the only one to which our attention is now called is in reference to the clause just quoted, which was amended to read as follows: ''shall forfeit and pay as a penalty, for every such person, employee or passenger so dying, the sum of not less than two thousand dollars and not exceeding ten thousand dollars, in the discretion of the jury, which may be sued for,'' etc.

Of that amendment the learned counsel for defendant say:  ''In other words, this Session Law being highly penal, while the Legislature, as a police regula-

tion, could fix any reasonable sum as the value of a man's life, or by way of punishment for the death of a human being, killed by negligence, this is peculiarly a legislative function and the Legislature could not abrogate this function, or delegate the exercise thereof to a trial jury, without establishing some lawful basis for the jury's discretion."

The words, "as a penalty" inserted by the amendment add nothing to the meaning or effect of the section; we have always held it a penal statute, but the placing of a minimum and maximum limit to the amount of the penalty, introduces an entirely new feature and it is of that that appellant complains.

Appellants contention is that the Act of 1905, essaying to confer on the jury a discretion, within specified limits, of fixing the amount of the penalty, is in effect an attempt to deprive appellant of its property without due process of law which is forbidden by section 30, article 2 of the Constitution of Missouri, and also by the Fourteenth Amendment to the Constitution of the United States.

The governmental function of declaring an act a crime or other offense against the law, to which a penalty may be affixed, can be exercised only by the legislative department, it cannot be delegated; to that extent the appellant is correct in its position. And it is also correct to say that the prescribing of the punishment or penalty is a legislative function that cannot be delegated, for example, the General Assembly could not forbid the commission of a certain act and say that one convicted thereof should be deemed guilty of a felony or misdemeanor and suffer such punishment as the jury might see fit to impose. But when the General Assembly has declared an act either a crime or negligence deserving a penalty and has prescribed the punishment or penalty within limits, not less or more, it is not a delegation of legislative power to leave to the jury the fixing of the extent to the punishment or

amount of the pecuniary penalty, within the prescribed limits, to be applied to the particular case. That has long been the course of criminal procedure in this State and even in states where it is not left to the jury it is left to the court to fix the penalty within the prescribed limits. Indeed the Legislature could not without inequality and injustice, in most cases, prescribe a fixed penalty, because the circumstances under which a particular act is done usually distinguish it in degree of offense from another similar act forbidden by the same statute. It has been from time immemorial in England, from whom we inherited the common law, and in this country, for the legislative department of the government to prescribe the punishment or penalty, within limits except in certain cases, and leave it to the courts to fix the extent in each case. In Ex parte Dusenberry, 97 Mo. 504, the petitioner was indicted for a crime for which it was prescribed that on conviction he should "suffer death or be punished by imprisonment in the penitentiary not less than five years, in the discretion of the jury." It was there claimed that the law was unconstitutional because it delegated to the jury the discretionary power above indicated. But this court said that there was no doubt but that "the Legislature may lawfully vest in the triers of fact a power to determine the punishment within certain limits." If the General Assembly may lawfully leave it to the discretion of the jury in such case to deprive a man of his life or his liberty for such period as they may determine, without violating the "due process of law" clause of the Constitution, it does not violate that clause when in a case of this kind it leaves it to the discretion of the jury to assess the penalty at not less than two thousand or more than ten thousand dollars. We have examined the cases referred to by the learned counsel for appellant in support of their contention, but we do not think they reach the point in question. In Louisville & Nashville Railroad Co. v. Common-

wealth, 99 Ky. 132, the Supreme Court of Kentucky held a statute of that State unconstitutional, but, as we understand the case, not on the ground that the statute left it to the jury to assess the amount of the fine "at not less than five hundred dollars nor more than one thousand dollars" but because it left it to the discretion of the jury to say whether an act was criminal or not. The Kentucky statute declared that if any railroad corporation should charge, collect or receive more than "a just and reasonable rate of toll or compensation for the transportation of passengers or freight" or for the use of a car, it should be deemed "guilty of extortion." The point decided was that the statute did not say what rate of toll or compensation should be deemed "more than just and reasonable" to constitute the crime but left that to the jury; it left the jury to say whether or not a certain act was a crime.

The decision by a Federal judge in Tennessee, also cited, is to the same effect. The New Jersey case also cited by appellant, as we understand it, holds substantially as we have above held. [Cigarmakers' Union v. Goldberg, 72 N. J. L. 214.] The New Jersey court construed its statute to mean that the penalty between the minimum and the maximum limits was unconstitutional because it "was to be determined by the party to be benefited thereby," and after so saying it used this language: "The fixing of the precise legal penalty to be imposed must be essentially either a legislative function, in which only general considerations can have weight, or a judicial function in which general considerations may be modified by special circumstances."

The learned counsel in their brief concede "that damage acts which subject railroads to additional penalties over those which may be assessed against private individuals may be upheld because of the peculiar hazardous nature of the business of railroading rather than upon the mere occupation of railroading" (as indeed has been too frequently decided to admit now of

a question), but they say that "before such statutes can be upheld they must be based upon the dangerous nature of railroading or they will furnish an illegal classification." And they conclude their argument on this point by saying: "And where, as in this instance, the statute is susceptible of enforcement so as to subject different railroads to various and different penalties for practically the same acts, it certainly violates the constitutional provisions intended to protect all classes of citizens from such unequal and unjust discrimination." If there was never any difference in the circumstances attending the killing of different people by the negligent running of trains, etc., the Legislature might prescribe a fixed amount as the penalty in every case, as indeed was done in the statute in question before the amendment, but experience seems to have taught the lawmakers that different circumstances covered different cases and they saw fit to provide that the jury might within limits adjust the amount of the penalty to the circumstances of the particular case; the discrimination allowed is not against the particular defendant but on account of the circumstances of the particular case. We hold that the Act of April 13, 1905, Laws 1905, pages 135-137, is constitutional.

II. We come now to the case on its merits. The plaintiff's testimony tended to show as follows: Her father was a section hand in the employ of the Missouri Pacific Company; one of his duties was to walk over the track at certain times from Webb City to Carthage to inspect the road; it was against the rules of the company and contrary to his orders for him to ride a velocipede over the road on his inspection route, but on the morning of the accident he had obtained a velocipede and was riding over his route; he was going east towards Carthage, and the train which struck him was going in the same direction; the point of the accident was about 150 feet east of the east approach

to the railroad bridge over Center Creek and near a water tank. Coming from Webb City the road (or the part we are concerned with) runs northeast until it reaches a point about 500 or 600 feet from Stout's creek, whence it curves east at an angle of 3 ° 56′ for a distance of 600 or 700 feet; from the east point of the curve to the water tank and beyond the track is straight; from the east point of the curve to the water tank the distance is 836 feet; according to plaintiff's testimony the point where the deceased was struck was about 100 feet east of the water tank. There is a trestle west of the bridge 333 feet long, which forms the bridge approach; the bridge is 150 feet long. It was down grade from the east point of the curve to and beyond the place of the accident; the train was running 35 miles an hour. No witness for the plaintiff saw the accident. The one who came nearer seeing it than any other testified that he saw the deceased mount his velocipede and start down the road. He said: "I turned around and started off and looked again, he was on the speeder crossing the trestle, at that time the train was coming, I heard it at the Carterville crossing whistle." The Carterville crossing was a mile west; there was no other whistle sounded until the train got across the trestle. Afterwards the witness said that he heard the whistle for the Carterville crossing before the deceased got on the road. He was asked if there was anything to prevent the engineer and fireman from seeing the deceased on the road and he answered, "nothing at all that I could see." Neither the question nor the answer indicated at what point on the road the train was when the deceased was in view but the witness had just been speaking of the public road crossing, which by the diagram in evidence was 143 feet from the west end of the trestle and 476 feet from the west end of the bridge; the witness however stated it was over a quarter of a mile to the water tank. We infer the witness referred to that crossing

227 Sup—21

as the point from which the engineer and fireman could see the man on the track. Witness saw the man twice after he got on the track, first he was on the trestle and the train was coming, the witness heard it, second "he was right at the end of the bridge" (which end not stated). "The engine ran in so close I couldn't well see him." "Did the engineer or trainmen put on the air or make any effort to stop that train? If they did I couldn't hear it at all." Witness was 150 yards from the track when the train passed. When the man on the velocipede and the engine passed into the bridge witness lost sight of both and did not see the collision. The whistle gave one long blast after it crossed the bridge. On cross-examination witness was asked if the engineer could see the man on the bridge until he got around the curve where the track was straight; he answered, "He couldn't see him until he got around the curve but he could see through it alright." Asked by the court how far it was from the curve to the west end of the bridge witness said it was about half a quarter, "after he comes around this curve he ought to see him, he could see though about half a quarter." Witness gave it as his opinion that the engineer could have stopped on the trestle. He had never had any experience running an engine. Asked if he had ever seen a passenger train equipped as this was going 35 miles an hour down grade attempted to be stopped within that space, said he had not. Another witness, a boy 14 years old, did not see the man before the collision, but saw him when he was thrown up in the air by the striking of him by the engine; his attention was drawn to the scene by hearing the whistle and the escaping steam and in that instant he saw the man thrown up before the engine. He had heard no whistle before that. Another witness was on an electric car that passed near the scene. He testified that when he first saw the man on the speeder "he was near the overhead trestle work" and passing

east; "he was going a reasonably slow rate of speed" and watching the track; the car witness was on soon made a turn which shut the man from view, "just then I noticed the engine approaching the east end of the main part of the bridge, the engine when I saw it was almost running into the overhead trestle work of the bridge," the turn of the car obstructed further view and the witness saw no more of it. He had heard no whistle up to that time. "Q. How long afterwards before you heard any at all? A. Well, seconds seemed like minutes right there. I can hardly tell how long; it was a very short duration, because the street railway car hadn't struck the end of the trestle work when I first heard the rumbling of the train, in any manner or form." On cross-examination he said the man on the speeder was about the middle of the bridge when he first saw him and was twenty or thirty feet east of the bridge when the engine came on the west end of the bridge. Witness did not see the collision. One witness who said he had experience as a railroad loco-motive engineer sixteen years gave it as his opinion that this train, under the conditions named, running thirty-five miles an hour down grade could have been stopped in a distance of 200 feet.

Another witness, a boy fourteen years old, testified that he was driving cows to pasture at a distance of half a mile east of the bridge; he heard the whistle and ran to head off the cattle from crossing the track, and there he saw the engine coming; it ran a quarter of a mile east of the water tank before it stopped, then it backed. A witness who was a passenger on the train testified that he heard no whistle or application of the air until they were on or near the bridge, then he heard or felt the air applied and the stop was quite sudden, the train stopped with the rear coach opposite to the water tank.

The foregoing is the substance of the evidence on the part of the plaintiff tending to show that the engi-

neer or fireman saw the deceased in time to have averted the accident by the exercise of ordinary care.

The engineer and fireman, witnesses for defendant, testified that they did not see the deceased until they had passed out of the curve and came into the straight track, then they both saw him. The engineer's testimony was: "As I came around the curve to the Center Creek bridge I seen the man crossing the bridge on the speeder. I reached for the whistle cord with one hand and the brake valve with the other. At the time the man got at the end of the bridge he got off the speeder and got down the dump clear off the right of way and as soon as he stopped himself he ran back up and caught hold of the speeder and pulled one end of the speeder on the ties and remained in that position until I struck him. It was only a second or two from the time the man stopped himself as he jumped down the embankment until he got back to his speeder." He said he was about 150 yards distant from the man when he first saw him, about 300 feet from the west end of the trestle; as soon as he saw him he used all the appliances at hand to stop the train; the track at the point was down grade about one per cent. In his opinion the train going as it was could have been stopped in 600 or 700 feet, not less. The fireman's testimony was to the same effect.

At the close of the plaintiff's evidence and again at the close of all the evidence defendant asked an instruction to the effect that plaintiff was not entitled to recover, which was refused and exception saved.

In the above statement we have omitted a great deal of evidence tending to show that the plaintiff's father was himself guilty of negligence that contributed to the accident, and this we have done because that is a fact conceded, at least it is not contradicted. The plaintiff's petition states a cause of action based on the humanitarian doctrine alone, and the instructions under which the cause was submitted to the jury

were on that theory. The petition states that the servants of the defendant in charge of the engine saw the plaintiff's father in his position of peril in time to have saved him if they had used ordinary care, but that they negligently, wilfully and wantonly failed to use the appliances at hand to do so.

This is not a case in which the defendant's servants were chargeable with the duty of being on the lookout for a person on the track, but it is a case where they had a right to a clear track and no cause to suspect that the track would not be clear, therefore it is not a case where it can be said that the defendant is liable if the engineer and fireman saw or by the exercise of ordinary care could have seen the position of danger in due time, but the defendant would be liable only if the men in charge of the engine actually saw the deceased in time to have averted the accident under the conditions and with the means at hand. We have quoted the defendant's evidence on this point not for the purpose of weighing it against that of the plaintiff but only to see how far if at all it aided the plaintiff's evidence in making out a case. The defendant's is the only direct evidence, however, to the effect that the engineer and fireman did see the deceased before the collision, but it is to the effect that as soon as they saw him they did everything in their power to save him but it was too late. When they saw him they said they were about 150 yards distant on a down grade going thirty-five miles an hour. One witness for the plaintiff testified that from the Lakeside crossing the engine could have been stopped on the trestle, which, according to the diagram, even counting to the extreme east end of the trestle, would be about 375 feet. But that testimony was not competent, the witness had never had anything to do with running an engine, had had no experience at all that rendered him qualified to give an opinion on that subject.

The other witness who testified that the train in question under the conditions named could be stopped within 200 feet was a man whose experience qualified him to express an opinion on that subject, therefore, his was competent testimony. Whilst evidence of that kind is in the nature of what we call opinion evidence, yet it is something more than a mere opinion. When a man has by long experience in running and stopping trains, observed the distance in which he has often under similar conditions stopped them, he knows as a fact in what distance it can ordinarily be stopped; conditions of course may vary, causing the stop to be more or less short or long of the space expected, and to that extent such testimony is a matter of opinion. This train was going thirty-five miles an hour on a down grade of one per cent; if it could be stopped in 200 feet, the stop would be in about four seconds of time. A jury cannot take judicial cognizance of the space within which a train under these circumstances could have been stopped, yet in weighing the opinion evidence they are bound to exercise their own common sense, they were not bound to believe it because the witness had so testified, and if the jury in this instance had discarded the opinion of this witness as unreasonable, they would have been in the lawful exercise of their prerogative in so doing. That was all the competent expert evidence, however, on the part of the plaintiff tending to show that the train could have been stopped sooner that it was. The testimony on the part of the defendant however tends to show that the train could have been stopped within 600 or 700 feet, and that looks reasonable. Now let us see within what distance it was stopped. From the point of the curve nearest to the bridge to the water tank was 846 feet; the evidence conflicts as to how far the train ran beyond the water tank before it stopped; plaintiff's evidence tends to show that the point of collision was about 100 feet east of the water tank; the engineer said

it was not over twenty or twenty-five feet, and that when the train stopped the rear coach was just opposite the point where the deceased lay; one of plaintiff's witnesses makes that statement also, but another one said it ran a quarter of a mile beyond the tank and backed to the place of the accident. The train was estimated to be 120 or 200 feet long; there were two passenger coaches, a baggage car, the tender and the engine. Taking the engineer's estimate the engine ran at least 150 feet beyond the water tank; that would make the whole distance the engine ran from the point of the curve until it stopped 996 feet. Taking the plaintiff's witness who estimated that the train ran a quarter of a mile beyond the tank and backed to the scene of the accident, even if we discount his estimate fifty per cent or more, the train ran considerably over 1000 feet from the point where the man came into view before it stopped. The testimony of the passenger who said the air was not applied until the train was on the bridge and that the stop was quite sudden is also to be considered.

The engineer testified that he realized the man's danger as soon as he saw him, but we need no testimony to prove that a man on a bridge in front of a fast coming train is in peril. It is true as insisted by appellant that the testimony of the engineer and fireman to the effect that the man had gotten off the velocipede and down the embankment where he was safe, and ran back again in face of the engine then very near him, is uncontradicted, but the court could not assume that the testimony was true; if the fact was as so testified it was a complete defense to the cause of action stated in the petition, but whether it was so or not was a question for the jury and it was given to them to say. Under this condition of the evidence the court could not have done otherwise than submit the case to the jury.

III.   The first instruction given at the request of the plaintiff was as follows:

"The court instructs the jury that if you believe from the evidence in this case that Pansey Middleton was at the time of her father's death, the only minor child of Lewis Middleton, deceased; that no wife survived him; that on February 11, 1905, this Missouri Pacific Railway Company owned the line of railway between Carthage and Joplin mentioned in evidence, and that the plaintiff's father was at that time in the employ of said railway company as section hand, and as such was at the time of the accident complained of engaged in inspecting the tracks on that part of said railroad where the accident occurred, going east over said track on a railroad velocipede commonly called a speeder, and that about eight o'clock in the forenoon of that day while plaintiff's father was engaged in the line of his duty inspecting said track on said speeder, a passenger train composed of a locomotive and train of cars operated by the St. Louis, Iron Mountain & Southern Railway Company, over and upon the tracks of the Missouri Pacific Railway Company, approached said Middleton from the west, and that at the point of the accident the track was straight with nothing intervening to obstruct the view of the trainmen for some distance, and that said Middleton became in great danger of being run over and killed by said train; that both the said engineer and fireman saw him from the time the train was about twelve hundred feet away until he was struck and killed, and knew that he was unaware of the near and dangerous approach of said train; and that the engineer became aware of Middleton's perilous position on said track in time to have enabled him with the exercise of ordinary care to have prevented the accident and avoided running the locomotive against him, by stopping or placing the train under control or sounding the usual danger signals, and that said engineer failed to use the appliances at

hand to stop or place said train under control or to sound said danger signal but ran the locomotive against said Middleton and killed him, and if you further believe from the evidence that the St. Louis, Iron Mountain & Southern Railway Company was authorized or permitted by the Missouri Pacific Railway Company to operate the train in question upon the tracks of the latter company at a point where the accident occurred, then the plaintiff is entitled to a verdict at your hands against the St. Louis, Iron Mountain & Southern Railway Company.''

That instruction assumes, or at least authorizes the jury to find, that the plaintiff's father at the time of the accident was on the track in the due performance of his duty, from which an inference might improperly be drawn that he was where his duty then called him, where he had a right to be and therefore was not negligent. If that was not the inference intended to be drawn then the fact was wholly irrelevant. It was immaterial under the theory on which the case was submitted to the jury whether he was there in the line of his duty or as a trespasser. The defendant would have owed a mere trespasser, under the evidence in this case, the same duty that it owed this man, that is, not to injure him after the engineer saw him and realized his danger if by the exercise of ordinary care it could avoid doing so. If that part of this instruction was intended or was liable to authorize the jury to find that the plaintiff's father was not guilty of negligence in inspecting the track under the circumstances shown in the evidence, then it was error because there was no evidence that authorized such a conclusion; the evidence showed he was negligent. There was evidence tending to show that he was a section hand and that it was his duty at times to inspect the track, and a witness for the plaintiff testified that at the time of the accident he seemed to be inspecting the track, but the plaintiff's evidence also showed that

he knew this train was coming. It was a regular passenger train on its schedule time; he stood by the track, according to plaintiff's chief witness, apparently listening for the train; the witness heard it and the deceased must have heard it, then the deceased put the speeder on the track and started down the road as if to beat the train across the bridge. The evidence was that he was forbidden to ride on a velocipede in going over his inspection route and to that extent he was on this occasion violating his orders. Perhaps if he had not provided himself with the velocipede he would not have undertaken to speed down the road in front of a train that he knew was coming, but we do not attach any importance to that fact, it only is an item going to prove an immaterial fact, that is, that the deceased was guilty of contributory negligence. His duty did not call him to go on a long trestle and bridge so close to a coming train as to endanger his life, therefore the mere fact that he was there inspecting the road did not authorize the jury to find that he was there in the line of his duty. It makes no difference, under the only theory on which the plaintiff's cause of action rests, whether the deceased was, at the time, in the line of his duty or was a trespasser, but the instruction authorizing the jury to take into consideration the fact that he was there in the due discharge of his duty throws into the scales weighing the evidence an item that should not be considered, a fact that tends to enlist the sympathy of the jury and prejudice the defendants. The jury was authorized by that instruction to find that the deceased was wholly in the right and the defendant wholly in the wrong. Perhaps if that were the only error in the instruction it might be passed over on the idea that it was harmless, because it authorized a finding of an immaterial fact, but it was not the only error. There is another hypothesis in the instruction that should not have been submitted; it authorizes the jury to find that the engineer

and fireman not only saw the peril, but also knew that the deceased was unaware of the near approach of the train and failed to sound the whistle to warn him. There was no evidence that the engineer or fireman knew that the deceased was unaware of the near approach of the train or that the sounding of the whistle would have done any good. When a man is seen heedlessly walking along a well beaten footpath inside the track in front of an approaching train, when it is apparent that he could easily step aside and be out of danger, the situation suggests that probably he is unaware of his peril; under those circumstances the duty should devolve on the engineer to sound the whistle to give him warning. But in this case the man was on the bridge when they first saw him; it was impossible for him to escape except to beat the train across where he could jump to the ground. This instruction authorizes a verdict for the plaintiff for the failure of the engineer to sound the whistle, that is, it authorizes a verdict for the plaintiff if the engineer either failed to use ordinary care to stop the engine or to sound the danger signal. We cannot know from this verdict whether the jury found for the plaintiff on the ground that the engineer failed to stop as soon as he could or that they based the verdict on the fact that he failed to sound the whistle. There is nothing in the evidence in this case to indicate that the sounding of the whistle would have done any good. In fact the plaintiff's expert witness, the railroad locomotive engineer of sixteen years' experience, said that in such an emergency he would not apply the whistle; he said: "What's the use going to whistle? You better try to stop without bothering the whistle." In that respect this case is unlike Hinzeman v. Railroad, 182 Mo. 611, or Reyburn v. Railroad, 187 Mo. 565, or Eppstein v. Railroad, 197 Mo. 720. In either of those cases it seemed that if the engineer had sounded the whistle the life would have been saved. But nothing so ap-

pears in this case and it was error to instruct the jury that they could find for the plaintiff if they should find that the whistle was not sounded; nothing would have saved the life of this man, so far as we can judge from the evidence, except the stopping of the train. It was error to have given that instruction. The same error as to the sounding of the whistle runs through the second instruction.

IV. At the request of the defendant the court gave five instructions, and refused sixteen others. We do not deem it necessary to discuss each one of those sixteen refused instructions, it is sufficient to say that all that was good in them was contained in the five given, and what was not so contained was not the law, therefore the instructions were properly refused. Some of the refused instructions related to the measure of damages and were in that respect predicated on the proposition that the Act of 1905, amending section 2864, was unconstitutional. Others required the jury to find that unless the conduct of the engineer and fireman was "wanton, willful and reckless" the verdict should be for the defendant. We do not recognize degrees of negligence and whilst the terms "wanton, willful and reckless" are sometimes used in characterizing conduct yet, after all is said, the law applies only the word "negligent." Negligence is a failure to perform a duty. The law recognizes degrees in care, very high care and ordinary care, but the failure to exercise the highest degree of care required is only negligence, whilst failure to exercise ordinary care is also negligence, neither more nor less. Liability attaches from the failure to exercise the care required by the law— negligence—but when the liability is established, the character of the defendant's conduct, whether merely inattentive, or willful, wanton or reckless, is a fact that may be sometimes considered in assessing the damages. If it be a case in which the damages as for compensa-

tion to the person injured be in question, the jury after assessing compensatory damages may, in a proper case, look into the character of defendant's conduct to see if punitive damages should also be awarded. In the case at bar, however, the damages are not given as compensation to the party aggrieved, but as a penalty which the law prescribes for the negligent killing of a human being; it is all penal in its character and in fixing the penalty the jury have a right to consider the conduct of the negligent party beyond the mere finding that he was negligent; they may consider whether the conduct which resulted in the catastrophe arose from mere inattention, or was willful, wanton or reckless. That is what the jury does in assessing the punishment for a crime and it is what the amendment of 1905 to section 2864 authorizes the jury to do in assessing the amount of the penalty under that section of the statute.

For the errors in the plaintiff's instructions above pointed out the judgment is reversed and the cause remanded to the circuit court to be proceeded with according to law. All concur.