LUCINDA ARMBRUSTER, v. THE CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY, Appellant.

**Foreign statutes:** ENFORCEMENT IN THIS STATE. A foreign statute, penal in character and therefore contrary to the public policy of this state, will not be enforced by the courts of this state; but where the statutes of a foreign state give a right of action for the wrongful death of a person, and have been construed by the courts of that state as providing only compensatory damages, they will be so construed when sought to be enforced in this state.

**Actions:** ACCRUAL IN FOREIGN STATE: JURISDICTION. An action may be maintained in any state on a cause of action accruing in another state, if not contrary to the law or public policy of the state in which it is brought.

**Wrongful death:** RECOVERABLE DAMAGES: LAW OF FORUM. Only compensatory damages are recoverable in this state for a wrongful death; and in bringing an action here for a death occurring in a foreign state all claim for punitive damages which might be recovered in the foreign state is waived, as the amount of recoverable damages pertains to the remedy and is governed by the law of the forum.

**Same:** JURISDICTION. The mere fact that recoverable damages for a wrongful death occurring in a foreign state are not as great under the law of this state as in the foreign state, will not affect the jurisdiction of the courts of this state.

**Same:** RIGHT OF ACTION: CONFLICT OF LAWS. The fact that an action for a wrongful death may be maintained in this state by the personal representative of deceased, while in the state of Missouri, where the cause of action accrued, the right of action survives first to the surviving spouse and then to the minor children of deceased, presents no such conflict in the policy of the statutes as will defeat the action brought in this state.

**Same:** DEATH OF RAILWAY EMPLOYEE: INTERSTATE COMMERCE: WHAT LAW GOVERNS. Where decedent was employed in coaling a railway engine, which was being made ready for hauling freight from the state

of Missouri and other states into the state of Kansas, he was engaged in interstate commerce; and the action for his injury and death while thus employed should have been brought and determined under the act of congress governing the liability of common carriers for injuries to employees, rather than under the state statutes.

Federal statutes: CONSTRUCTION. The liberal construction given the Federal Employers' Liability Act by the federal courts will be followed by the state courts in an action under that statute.

Interstate commerce: EVIDENCE. The identification of the tender of the engine, which decedent was loading when killed, by an employee whose duty it was to keep a record of each engine and tender supplied with coal, as the one attached to the train hauled into another state, was sufficient to support a finding that it was being used in interstate commerce.

*Appeal from Iowa District Court.*—HON. R. P. HOWELL, Judge.

SATURDAY, MAY 16, 1914.

ACTION for damages resulted in judgment against defendant, from which it appeals.—*Reversed.*

*F. W. Sargent* and *Robt. J. Bannister,* and *John F. Cronin,* for appellant.

*Wade, Dutcher & Davis,* and *Hubbell Bros.,* for appellee.

LADD, C. J.—The deceased, Henry Armbruster, was employed as hostler's helper, and on June 10, 1910, while on a tender, attached to an engine pulled the door or apron of the coal chute down and allowed the coal to run from the pocket into the tender. After the coal had run out, he pushed the door or apron up, when it failed to catch or latch at the top and dropped back. He had bent over to spread the coal in the tender, and it struck him on the head, thereby causing injuries which resulted in his death. The particular chute was next to the north of a series of twenty chutes at Trenton,

Mo., the bottoms of which were about eighteen feet from the ground. As the top of the tender was between eleven and twelve feet from the ground, the lower part of the apron must have been four to six feet above the tender. Blocks under the chute held the door or apron when lowered in place, and weights were used to balance the aprons so that these would rise readily to a closed position. There was an inner door which raised twelve or eighteen inches as the apron was let down, through which the coal ran from the pocket to the tender. A witness testified: "There are irons on the inner door that hold it in position until corresponding irons on the outer door drop them as the outer door comes down releasing the inner door. Until these irons are lifted up by the levers on the outer door, they hold the inside door closed. When the inside door does interfere in any way with the closing of the outer door, the outer door will not go near to the top; it stops lower down and usually remains where it stops. The weights hold it. If a chunk of coal should get caught it remains; the weights on the legs hold it." Of course, if coal or dirt prevented the inner door from going down, the outer door or apron could not rise to the top. The witness thus described the outer door: "The outer door of the second pocket is five three-tenths feet high and five feet eight-tenths wide. There are twelve bolts in each of these cross-pieces. There are three of the cross-pieces that are two inches thick. The sharp end of the bolt is on the outside of the cross-piece. There is a nut on it. The weight of this door is, to my knowledge, it would be about five hundred or six hundred pounds. It is twenty-four and two-tenths feet from the top of the outside door when it is in a closed position to the ground. These levers extend six and five-tenths feet below the bottom ledge of the outside door. It is four and forty-five one-hundredths feet from the east rail of the railroad track to the trestle work on the west side. The coal bin of a 1900 engine is ten and two-tenths feet wide, fourteen and five-tenths feet long, eleven and six-tenths feet high. The top of a 1900 engine is eleven and

six-tenths feet from the top of the tie. The engines that begin with No. 1900 are of the same size.'' ''Before the injury to Mr. Armbruster, the two north ones were lowered to drop lower down. They were lowered about a foot and a half, in order to coal the low engines. After they were changed, they threw the coal about center way of the tender. In order to cause this outer door to reach lower to the tender, the bump block was raised. That is a block which the legs or arms of the door strike against. The trip irons or trigger were bent. Crooked irons were put on so that the lever would go higher before striking the trip iron. At the time these two north pockets were lowered, the weights were not put any lower down on the levers.''

The evidence on the part of plaintiff tended to show the weights were not so adjusted as to properly balance the apron, and, though there was testimony to the contrary, the jury might have found that the defendant was negligent in not so adjusting these as to avoid the danger of the apron falling back upon employees after being hoisted. There is no occasion to review the evidence bearing on this phase of the case. It is enough to say that the issue as to negligence in the above respect was for the jury to determine.

II. The plaintiff first filed a petition claiming damages as widow of deceased, under the laws of Missouri. The defendant in its answer thereto alleged that, at the time of the injury, it was engaged as a common carrier in interstate commerce, and that the deceased was employed by defendant therein, and for this reason the plaintiff was not entitled to recover under the laws of Missouri. Later, on August 4, 1911, the widow, as administratrix of the estate of deceased, began an action claiming damages under the federal Employers' Liability Act of Congress, approved April 22, 1908 (35 Stat. 65, code 149, U. S. Comp. St. Supp. 1911, page 1322) and the defendant answered by way of a general denial. On motion, the two causes of action were consolidated and tried together. At the close of plaintiff's evidence, a motion to require plaintiff to

elect which cause of action it would prosecute was overruled, but, at the close of all the evidence, the court, on defendant's motion, required plaintiff to so elect and she chose to proceed with the action, claiming damages as widow of deceased under the laws of Missouri. The right to recover was challenged in several ways, not necessary to be enumerated, and it is now insisted that, owing to the differences between the laws of Missouri and those of this state, the plaintiff ought not to be permitted to maintain the action. The statutes of that state, in so far as necessary to a full understanding of the question involved, may be set out:

Section 5425 of Revised Statutes of Missouri:

Whenever any person . . . shall die from any injury resulting from or occasioned by the negligence, . . . of any officer, agent, servant or employee whilst running, conducting or managing any locomotive, car or train of cars, . . . the corporation . . . in whose employ any such officer, agent, servant, . . . shall be at the time such injury is committed, . . . shall forfeit and pay as a penalty for every such person, employee or passenger so dying, the sum of not less than $2,000.00 and not exceeding $10,000, in the discretion of the jury, which may be sued for and recovered first by the husband or wife of the deceased; or, second, if there be no husband or wife, or he or she fails to sue within six months after such death, then by the minor child or children of the deceased. . . . In suits instituted under this section, it shall be competent for the defendant, for its defense, to show that the defect or insufficiency named in this section was not of a negligent defect or insufficiency, and that the injury received was not the result of unskillfulness, negligence or criminal intent.

Section 5426: When Representative May Sue.—Whenever the death of a person shall be caused by a wrongful act, neglect or default of another, and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, then, and in every such case, the person who or the corporation which would have been liable if death had not ensued shall be liable to an action for damages, notwithstanding the death of the person injured.

Section 5427: Damages, by Whom Recoverable, Measure of.—Damages accruing under the last preceding section shall be sued for and recovered by the same parties and in the same manner as provided in section 5425, and in every such action the jury may give such damages, not exceeding ten thousand dollars, as they may deem fair and just, with reference to the necessary injury resulting from such death, to the surviving parties who may be entitled to sue, and also having regard to the mitigating and aggravating circumstances attending such wrongful act, neglect or default.

Appellant argues that all these statutes are penal in nature and for this reason, being contrary to the policy of this state, will not be enforced here. Were this true, the result contended for necessarily must follow. *Taylor v. Telegraph Co.*, 95 Iowa, 740; *Cary v. Schmeltz*, 141 Mo. App. 570 (125 S. W.

1. FOREIGN STATUTES: enforcement in this state.

532); *Walsh v. Railway*, 201 Mass. 527 (88 N. E. 12); *Blaine v. Curtis*, 59 Vt. 120 (7 Atl. 708, 59 Am. Rep. 702); *Matheson v. Railway*, 61 Kan. 667 (60 Pac. 747); *Raisor v. Railway*, 215 Ill. 47 (74 N. E. 69, 106 Am. St. Rep. 153, 2 Ann. Cas. 802). That the statute first quoted is penal in character admits of no doubt. It allows more than actual compensation for the loss sustained and has been construed by the courts of Missouri as penal. *Philpott v. Railway*, 85 Mo. 164; *Rafferty v. Railway*, 15 Mo. App. 559; *Young v. Railway*, 227 Mo. 307 (127 S. W. 19). But no claim is made under section 5425 of the Missouri Revised Statutes, and indeed none could be, for the injury there contemplated must have resulted or been occasioned by negligence, unskillfulness, or criminal intent whilst running, conducting or managing a locomotive car or train of cars. *Peters v. Railway*, 150 Mo. App. 721, 740 (131 S. W. 917); *Hegberg, Adm'r, v. Railway*, 164 Mo. App. 549 (147 S. W. 192).

The action is based on section 5427, and the other two sections evidently were pleaded to show plaintiff's right to maintain the action. The sections were formerly numbers

2864, 2865, and 2866, and the Supreme Court of Missouri, in distinguishing them, said in *Casey v. Transit Co.*, 205 Mo. 721 (103 S. W. 1146):

The right of action given under section 2864 is not that given under sections 2865 and 2866, and that given under the two last-named sections is not that given under the former. These are purely statutory rights of action, and each must rest on its own statute. They may be joined in the same petition, but, when so, they should be stated in separate counts. The right of action given in section 2864 is for a death caused by the negligence of the servant operating the defendant's instrument of transportation, whether it be a locomotive, car, train of cars, steamboat, its machinery, stage coach, or other public conveyance, while the right of action given in the two sections next following is for a death caused by the negligence of the defendant, which may mean his own negligence, as, for instance, in furnishing an unsafe vehicle, or it may mean his negligence through his servant in some particular other than the particular specified in section 2864, for which, if the person injured had not died, he would have had a right of action.

And it was observed in *Crohn v. Telephone Co.*, 131 Mo. App. 313 (109 S. W. 1068), that "the Legislature clearly expressed the purpose of providing for the recovery of a penalty against the tort-feasor in an action falling within the scope of section 2864, and providing only for the recovery of compensatory damages in actions prosecuted under sections 2865 and 2866."

In *Honea v. Railway*, 245 Mo. 621, 648 (151 S. W. 119, 127), Graves, J., said of the last two statutes: "They are not in any sense penal statutes and have never been so construed." See, also, *Casey v. Transit Co.*, 205 Mo. 721 (103 S. W. 1146). This view has been approved in other states. *St. Louis, I. M. & S. R. Co. v. McNamare*, 91 Ark. 515 (122 S. W. 102); *Rochester v. Wells Fargo Ex. Co.*, 87 Kan. 164 (123 Pac. 729, 40 L. R. A. (N. S.) 1095).

These statutes, having been construed as providing for

compensatory damages only by the Supreme Court of Missouri will be so regarded here. *Fred Miller Brewing Co. v. Capital Ins. Co.,* 111 Iowa, 590; *McClure v. Campbell,* 71 Wis. 350 (37 N. W. 343, 5 Am. St. Rep. 220) ; *Watson v. Lane,* 52 N. J. Law, 550 (20 Atl. 894, 10 L. R. A. 784) ; *Bank v. Kirk,* 222 Pa. 567 (71 Atl. 1085, 128 Am. St. Rep. 823).

There is no merit in the contention, then, that in any event the action cannot be maintained in this state. An action may be maintained in any state on a cause of action accruing in another, if not contrary to the law or public policy of the state of the forum. *Morris v. Railway,* 65 Iowa, 727; *Boyce v. Railway,* 63 Iowa, 70; *Bradbury v. Railway,* 149 Iowa, 51. The development of the rule as thus broadly stated is traced in *Christensen v. Floriston Pulp & Paper Co.,* 29 Nev. 552 (92 Pac. 210) ; the court concluding that:

2. ACTIONS : accrual in foreign state : jurisdiction.

The right to bring such an action in a foreign jurisdiction does not rest, as some of the decisions seem to put it, upon principles of comity, but rather because 'the action by which the remedy is to be enforced is a personal, and not a real, action, and is of that character which the law recognizes as transitory, and not local.' Because the cause of action is in its nature transitory, courts of other jurisdictions will enforce such rights growing out of the laws of a foreign state, unless it can be said that such laws are contrary to the public policy of the state of the forum. As the common law did not recognize this cause of action, it may be said that the public policy of a state in this regard only goes to the extent that it by legislative enactment has changed the common law, and therefore that, unless the lex fori is substantially the same as the lex loci, the latter law will not be deemed consistent with the public policy of the forum. In determining whether the two acts are substantially the same, the policy of the courts has changed from the rather contracted view taken when the question was new to a broad and liberal view, which may now be said to very generally prevail. A very proper rule for guidance may be deduced from the following language of the Supreme Court of Appeals of New York in *Wooden v. Rail-*

*road Co.*, 126 N. Y. 10 (26 N. E. 1050, 13 L. R. A. 458, 22 Am. St. Rep. 803): 'We refer to the lex fori, and measure it by and compare it with the lex loci, I think, for two reasons: One, that the party defendant may not be subjected to different and varying responsibilities; and the other that we may know that we are not lending our tribunals to enforce a right which we do not recognize, and which is against our own public policy, and we do not refer to our law as creating the cause of action which we enforce.' See *Romano v. Capital City Brick & Pipe Co.*, 125 Iowa, 591.

There is no reason for not enforcing the liability arising under these statutes unless it be owing to some difference in the remedies available in the two states. It appears that in Missouri exemplary damages may be recovered where there are aggravating circumstances, and this seems to be contemplated by section 5427 of the Revised Statutes of that state. Her courts have so said. *Fisher v. Packing Co.*, 77 Mo. App. 108; *Gray v. McDonald*, 104 Mo. 303 (16 S. W. 398); *Haehl v. Railway*, 119 Mo. 325 (24 S. W. 737); *Nagel v. Railway*, 75 Mo. 653 (42 Am. Rep. 418).

Only compensatory damages as a consequence of wrongful death are recoverable in Iowa, and, in bringing the action here, the plaintiff must be deemed to have waived all claim to punitive damages. This was the view of the court in *Higgins v. Railway*, 155 Mass. 176 (29 N. E. 534, 31 Am. St. Rep. 544), where the action was based on a wrong committed in Connecticut resulting in death. The court assumed that, in bringing suit in Massachusetts, the plaintiff waived the right to recover exemplary damages not allowable there, which might have been included had the action been tried in Connecticut.

3. WRONGFUL DEATH: recoverable damages: law of forum.

In *Evey v. Mexican Central Ry.*, 81 Fed. 294 (26 C. C. A. 407, 38 L. R. A. 387), the injury was suffered in Mexico, and, though damages peculiar to social position were allowable under the Mexican statute, they might be omitted in Texas. In one portion of the opinion, the court remarked: ''Our

opinion on this branch of the case is that the difference in the mode of arriving at and administering the damages is a matter that affects the remedy only.''

In *Wooden v. Railway*, 126 N. Y. 10 (26 N. E. 1050, 13 L. R. A. 458, 22 Am. St. Rep. 803), the action was brought in New York for causing the death of the intestate in Pennsylvania, where the amount of damages was not limited, and the court found no more recoverable than allowed by the statute of New York.

It is well said in Minor on Conflict of Laws that: ''Occasionally some point may arise under differences between the *lex delicti* and the *lex fori* as to the elements to be taken into consideration in estimating the amount of damage. Such matters pertain to the remedy, and are to be controlled by the *lex fori,* since they do not involve any substantive right.'' The precise point was covered in *Rochester v. Wells Fargo & Co.*, 87 Kan. 164 (123 Pac. 729, 40 L. R. A. (N. S.) 109), where the court said:

Were he suing here for all that he might ask in Missouri, our courts could not grant him the relief sought; but, when he comes here in the same attitude in which a party would come if the statute authorized compensatory damages only, we see no reason why he may not, with as much justice and consistency, maintain his action as if the statute made no provision for other than actual damages. The difference in principle between the Kansas and Missouri statutes is that the one makes the recovery of punitive damages impossible, and the other makes such recovery possible only when the allegations and proof are such as to show wanton negligence. By entertaining a cause of action in which the plaintiffs seek only to recover actual damages, we are not violating any principle or policy of our own law, but are simply permitting a citizen of a sister state to proceed along the line upon which, for the purpose of this case, the policy of the two states is identical.

These authorities seem conclusive on this proposition. The mere fact that the remedy, available in the forum, may not be

as full or complete as *lex delicti* would afford would not alone

**4. SAME: jurisdiction.** justify the court in refusing to entertain jurisdiction, and in this case the circumstance that something more might have been recovered, in Missouri did not defeat the right to maintain an action for actual damages in this state.

While, under the statutes of this state, actions for wrongful death survive and may be maintained by the personal representative of deceased, and damages recovered thereby are distributed as personal property in Mis-

**5. SAME: right of action: conflict of laws.** souri, the cause of action survives but is maintainable first by the husband or wife of the deceased, and thereafter by the minor children, and it is contended that, because of this difference, the plaintiff, as widow, ought not to be permitted to prosecute the action in this state. The cause of action survives alike in both states, but in one to the personal representative of the deceased and in the other to the surviving spouse or minor children. The policy in each is that the obstacle to reparation which existed at common law be removed, and that the wrongdoer be rendered amenable to damages, notwithstanding the death of the victim. In neither state is the creditor of the deceased permitted to share the recovery; in this state the cause of action surviving to the personal representative as trustee for the heirs, which includes the surviving spouse, and in Missouri to the husband or wife or minor children directly. Though the beneficiaries differ, the policy expressed in the statutes of the respective states is the same, and there is no reason on this ground for denying the plaintiff the right of recovery.

It is well settled, as laid down in Minor on Conflict of Laws, section 201, that: "The *lex loci delicti* is the proper law by which to ascertain the person who is to sue for a death caused by wrongful act. The right to sue accrues, if at all, by reason of the statute of the *locus delicti,* and in general no one can take advantage of the right conferred by that law, save the person to whom that law gives it. . . . If the *lex*

*delicti* prescribes the widow, heirs, etc., as the proper parties to sue, while the *lex fori* prescribes the personal representative of the deceased, the same principle controls, and the party delegated by the *lex delicti* is the .proper plaintiff, without regard to the provisions of the *lex fori.*" As sustaining the text, see *Fabel v. Railway,* 30 Ind. App. 271 (65 N. E. 929) ; *Thorpe v. Union Pac. Coal Co.,* 24 Utah, 481 (68 Pac. 145). But this is not to be too literally construed, as appears in *Stewart, Administrator, v. Railway Co.,* 168 U. S. 445 (18 Sup. Ct. 105, 42 L. Ed. 537), where an action was brought in the District of Columbia to recover for wrongful death in Maryland, and the court, in deciding that it might be maintained by an administrator of the deceased notwithstanding the fact that the cause of action survived in Maryland to the widow and children, said:

What are the differences between the two statutes? As heretofore noticed, the substantial purpose of these various statutes is to do away with the obstacle to a recovery caused by the death of the party injured. Both statutes in the case at bar disclose that purpose. By each the death of the party injured ceases to relieve the wrongdoer from liability for damage caused by the death, and this is its main purpose and effect. The two statutes differ as to the party in whose name the suit is to be brought. In Maryland the plaintiff is the state; in this district the personal representative of the deceased. But neither the state in the one case nor the personal representative in the other has any pecuniary interest in the recovery. Each is simply a nominal plaintiff. While in the district the nominal plaintiff is the personal representative of the deceased, the damages recovered do not become part of the assets of the estate, or liable for the debts of the deceased, but are distributed among certain of his heirs. By neither statute is there any thought of increasing the volume of the deceased's estate, but in each it is the award to certain prescribed heirs of the damages resulting to them from the taking away of their relative. For purposes of jurisdiction in the federal courts, regard is had to the real, rather than to the nominal, party. . . . Another difference is

that by the Maryland statute the jury trying the cause apportion the damages awarded between the parties for whose benefit the action is brought, while by the statute of the district the distribution is made according to the ordinary laws of distribution of a decedent's estate. But by each the important matter is the award of damages, and the manner of distribution is a minor consideration. Besides, in determining the amount of the recovery, the jury must necessarily consider the damages which each beneficiary has sustained by reason of the death. By neither statute is a fixed sum to be given as a penalty for the wrong, but in each the question is the amount of damages. It is true that the beneficiaries of such an action may not in every case be exactly the same under each statute, but the principal beneficiaries under each are the near relatives, those most likely to be dependent on the party killed, and the remote relatives can seldom, if ever, be regarded as suffering loss from the death.

In *Boston & M. R. Co. v. McDuffey*, 79 Fed. 934 (25 C. C. A. 247), the action was brought in the Circuit Court of the United States for the District of Vermont by the wife and children of deceased, to whom the cause of action for his wrongful death survived in Canada, and it was held that they might maintain the action, although it must have been prosecuted in the name of the personal representative of the deceased in Vermont.

A like conclusion was reached in *Wooden v. Railway Co.*, 126 N. Y. 10 (26 N. E. 1050, 13 L. R. A. 458, 22 Am. St. Rep. 803) ; the court saying :

Upon the question of similarity, we have also held that the two statutes need not be identical in their terms, or precisely alike, but it is enough if they are of similar import and character, founded upon the same principle, and possessing the same general attributes. *Leonard v. Navigation Co.*, 84 N. Y. 53 [38 Am. Rep. 491]. It is quite evident that the two statutes are of similar import. They are founded upon the same principle, are aimed at the same evil, construct the same sort or kind of action, and give it for the benefit of the same class of individuals. In both the utter failure of redress at

common law, where the injury ended in death, was the injustice for which a remedy was enacted; and in both the new action was given for the benefit of those who had suffered an injury as the consequence of the wrong. This fundamental agreement in the main and substantial characteristics of the two statutes is not affected by the differences of detail which the demurrer points out. The first is that by the *lex loci* the proper person to bring this action, and the only person who can maintain it, is the widow, while by our law the right of action is given to the executor or administrator. But it is given to the latter, not in his broad representative character, but solely as trustee, in a case like the present, for the widow and children. *Hegerich v. Kennie*, 99 N. Y. 267 [1 N. E. 787, 52 Am. Rep. 25]. It is not a right which survives to the personal representatives, but a right created anew. The real parties in interest, those whose injury is redressed, whose right is vindicated, to whom all damages go, are one and the same in both forms. If the formal parties are different, the substantial and real parties are identical, and the difference in the trustee appointed by the law to represent their right is not such a difference as to bar our tribunals from their jurisdiction, or make the two statutes dissimilar under the rule.

The point was considered in *Herrick v. Railway Co.*, 31 Minn. 11 (16 N. W. 413, 47 Am. Rep. 771), where, upon full consideration, the court said:

It by no means follows that, because the statute of one state differs from the law of another state, therefore it would be held contrary to the . . . laws of the latter state. Every day our courts are enforcing rights under foreign contracts where the *lex loci contractus* and the *lex fori* are altogether different, and yet we construe these contracts and enforce rights under them according to their force and effect under the laws of the state where made. To justify a court in refusing to enforce a right of action which accrued under the law of another state, because against the policy of our laws, it must appear that it is against good morals or natural justice, or that for some other such reason, the enforcement of it would be prejudicial to the general interests of our own citizens. . . . The statute of another state has, of course, no extra territorial force, but rights acquired under it will

always, in comity, be enforced, if not against the public policy.
. . . In such cases the law of the place where the right of
action, . . . while all that pertains merely to the remedy,
will be controlled by the law . . . where the action is
brought.

In *Hanna v. Railway Co.*, 41 Ill. App. 116, the cause of
action arose in Canada, and in harmony with the decision
in *Stewart v. Railway Co., supra,* it was held that it makes
"no difference that the nominal plaintiff may be one person
in the state in which the action is given, and another person
in the state in which the action is brought, provided the action
in whosesoever name it is to be maintained, is seeking a similar
remedy." Under the statute of Illinois, recovery was to be
for the exclusive benefit of the widow and next of kin of the
deceased; under the Canadian, for the benefit of the wife,
husband, parent, and child, and the court, in holding these
differences not sufficient to defeat recovery, observed that any
difference there might be was not in the right given but in a
detail of the remedy which could be very easily carried out
without any change in the machinery of the courts or the pro-
cedure of the trial. It was held that the matter was not one
in which the wrongdoer was concerned, and that its interests
in any event were fully protected. In several of the cases,
the trend of modern decisions is said to be in favor of enforcing
in one state the rights of action created by the statutes of
other states or countries, and this appears in the text-books.

Thus Mr. Minor in his work on Conflict of Laws (section
200) states that: "The present tendency of the more recent
decisions is to advance still further towards liberality and to
throw open the courts to litigants whose cause of action has
arisen in other states and under the laws thereof, even though
not actionable at common law or not actionable if it had arisen
in the forum, provided the enforcement of the *lex delicti* would
not seriously contravene the established policy of the forum.
The presumption is in favor of the right to sue, and the burden
rests upon the party objecting to show that the enforcement

of the 'proper law' would be inconsistent with the domestic policy.''

In 8 Am. & Eng. Ency. of Law (2d Ed.) 883, it is said that: ''The better rule seems to be that no such similarity in the statutes is necessary, and that a variance between them in respect of the parties who must sue is not such a variance as will prevent an action in one state for an injury occurring in another by a party entitled by the laws of the latter state, to institute the suit.'' Numerous decisions are cited in support of the text.

In *Higgins v. Railway*, 155 Mass. 176 (29 N. E. 534, 31 Am. St. Rep. 544), the action was by wrongful death in Connecticut, and after observing that ''these principles require that, in cases of other than penal actions, the foreign law, if not contrary to our public policy, or to abstract justice or pure morals, or calculated to injure the state or its citizens, shall be recognized and enforced here, if we have jurisdiction of all necessary parties, and if we can see that, consistently with our own forms of procedure and law of trials, we can do substantial justice between the parties,'' proceeded:

The right created by the Connecticut statute is in terms a right to recover 'just damages.' Conn. Gen. Stats. 1888, section 1009. Neither the fact that the statute creating it limits the amount of the recovery to a sum not exceeding $5,000, nor that the damages are to be distributed to the husband, widow, heirs, or next of kin, makes it a penal action. The effect of such provisions as to the distribution of the damages is to say that they shall not be assets for the payment of debts, and shall not pass by the will of the deceased, but shall be applied to the compensation of the persons who are presumed to have suffered the most by the death of the person injured. Such a right is not unjust, nor contrary to good morals, nor calculated to injure the state or its citizens. Our courts have jurisdiction of the necessary parties. Looking at the statute creating the right of action as a part of the system of law in force in Connecticut, and considering that, if the action is to be prosecuted here, our rules of law regulating procedure, and fixing the elements which are to enter

into the assessment of the damages, must govern the trial, it is probable that the result will not be exactly the same as if the remedy had been pursued in Connecticut. But we see no such difficulty as to lead us to suppose that injustice may be done to the defendant, and none which ought to make us decline jurisdiction, if the plaintiff elects to sue here.

It needs hardly to be said that there is nothing obnoxious to our system of polity in these statutes of Missouri. The only difference is with respect to whom the cause of action survives, and no difficulty will be experienced by the courts of this state in administering justice in harmony with the laws of our sister state. The difference in beneficiaries is merely incidental, and the defendant will be as well protected as though the cause were there tried. The cause of action accrued to the deceased, and was transmitted by survival to the plaintiff, and as it was transitory, may be maintained in this state.

III. The court submitted the issue as to defendant's liability under the Missouri statute without exacting a finding whether deceased, at the time of the injury, was engaged in interstate commerce. The defendant had defi-

6. SAME: death of railway employee: interstate commerce: what law governs.

nitely raised the issue by alleging in its answer that it was engaged in operating a railway as a common carrier extending into the states of Missouri, Kansas, and other states, that deceased was injured while in its employment and engaged in coaling one of its engines at its chutes in Trenton, Mo., from which injuries he afterwards died, that the said locomotive engine was, at the time said Henry Armbruster was injured, in the yards at Trenton, Mo., being prepared for service in making the trip from the town of Trenton, Mo., to the town of Horton, Kan., for the purpose of hauling cars, merchandise, and other freight from the town of Trenton, Mo., to the town of Horton, Kan., which cars, merchandise, and other freight originated at other points in the state of Missouri and other states, destined to points in the state of Kansas, and other states; and

defendant alleges that the said Henry Armbruster was injured while an employee of the defendant, engaged in the preparation of said locomotive engine for the purpose aforesaid, and while supplying said engine with coal to use in moving said engine upon the trip aforesaid; and the defendant alleges that, at the time the said Henry Armbruster received the injuries aforesaid, the defendant, as a common carrier by railroad, was engaged in commerce between the several states and territories, and that the said Henry Armbruster was employed by the defendant in such commerce, and that the liability of the defendant for the injuries and death of the said Henry Armbruster, if any, accrues under an act of Congress relating to the liability of common carriers to their employees in certain cases, approved April 22, 1908.

The evidence disclosed that defendant was engaged in interstate commerce as thus alleged, and, if deceased suffered injury while he was employed by it in such commerce, the defendant was liable, if at all, under the act of Congress rather than the statutes of Missouri. *Bradbury v. Railway*, 149 Iowa, 51; *Mondou v. Railway*, 223 U. S. 1 (32 Sup. Ct. 169, 56 L. Ed. 327, 38 L. R. A. (N. S.) 44). His employment was that of a hostler's helper. At about 6 o'clock in the evening of June 10, 1910, the hostler brought an engine with the tender attached from the roundhouse to the coal chutes of defendant, arriving there about twenty minutes later. Deceased, as was his duty, pulled the door or apron down by seizing a chain, and the coal poured from the pocket over it into the tender, filling it, the door or apron was then pushed up, and in falling back caused the injury, as heretofore stated. The coal was the only fuel which generated the force operating the engine, and, after being supplied, it was moved to the coal track and left for the engine crew to take. The engine was identified as No. 1968 by the night foreman of the roundhouse, who testified that he kept a record showing the engines which were coaled each day, and that he knew from this record. One Morris testified that he was fireman and that as such

he took engine No. 1968 from the coal track at 7:30 or 7:40 o'clock, possibly 7:45. The engineer, Torrey, stated that he reached the engine at 8 o'clock, and that he left Trenton with it attached to a train at 8:40 o'clock that evening, and this was confirmed by the conductor. All agree that they went from there to Horton, Kan., reaching the latter place in the morning at about 8:45 o'clock, so that the engine and tender, which was filled with coal, as they hauled freight destined for different states, was actually employed in interstate commerce. The defendant insists that on this ground, and that intestate was injured in preparing the tender therefor, the jury should have been peremptorily directed to return a verdict for the defendant.

The federal courts, in applying the Employers' Liability Act of Congress, have given it liberal construction, and their construction is binding on the state courts.

7. FEDERAL STAT-
   UTES: construc-
   tion.

In *Zikos v. Oregon R. & N. Co.* (C. C.) 179 Fed. 893, the plaintiff, engaged in repairing defendant's main track, was directed by its section boss to drive partially driven spikes into the ties with a maul for the purpose of tightening the joints or rails, in pursuance of which he struck a spike, when, from the force of the blow, the head flew off and struck him in the left eye, destroying the sight, and inflicted other injuries. It was contended that repairing the track, being wholly in the state, was in no sense within the term "interstate commerce," and the court responded:

But the track of a railroad company engaged both in interstate and intrastate commerce is, while essential to the latter, indispensable to the former. It is equally important that it be kept in repair. Where the traffic itself is not in fact interstate, although upon a railroad engaged in commerce between the states, such as trains devoted entirely to local business and wholly within the boundaries of a state, a different case is presented. There it is possible to identify what is and what is not interstate; but where, as in this case,

a road is admittedly engaged in both, it becomes impossible to say that particular work done results directly for the benefit of one more than the other. Manifestly it is for the accommodation of both. To hold, then, that a workman engaged in repairs upon the track of such a carrier is not furthering interstate commerce would be to deny the power to control an indispensable instrument for commercial intercourse between the states, to deny the power of Congress over interstate commerce, but that the power extends to the control of those instrumentalities through which such commerce is carried on is not an open question. Where the employment necessarily and directly contributes to the more extended use, and without which interstate traffic could not be carried on at all, no reason appears for denying the power over the one, although it may directly contribute to the other. The particular question is an apt illustration of the intricacies to which our dual system of government often leads; but the intricacy is but an incident, and it can neither defeat nor impair the power of Congress over interstate commerce. Since the track, in the nature of things, must be maintained for commerce between the states, the work bestowed upon it inures to the benefit of such commerce. It is therefore subject to federal control, even though it may contribute to carriage wholly within the state. Being inseparable, yet interstate commerce inherently abiding in the thing to be regulated, as to the track, the state jurisdiction must give way, or at least it cannot defeat the superior power of Congress over the subject-matter whenever a carrier is using the track for the double purpose.

In *Colasurdo v. Railway* (C. C.) 180 Fed. 832, the plaintiff, a track walker, injured while repairing a switch without the yard, was held to be within the act.

In *Lamphere v. Oregon R. & N. Co.,* 196 Fed. 336 (116 C. C. A. 156, 47 L. R. A. (N. S) 1), the plaintiff was ordered by the defendant to proceed from his home to the depot to secure transportation there and go on board a certain interstate train which was due shortly and go to another town and relieve an engine crew which had been continuously employed for more than sixteen hours He proceeded to the depot

and had reached the crossing in the yards of the company where the cars were cut, when, without warning, they were suddenly closed by reason of other cars being negligently kicked against them, so injuring him that he died shortly afterwards. The court held the defendant liable under the Employers' Liability Act, saying in 'part:

The test question in determining whether a personal injury to an employee of a railroad company is within the purview of the act is: What is its effect upon interstate commerce? Does it have the effect to hinder, delay, or interfere with such commerce? As applied to the present case, it is this: Was the relation of the employment of the deceased to interstate commerce such that the personal injury to him tended to delay or hinder the movement of a train engaged in interstate commerce? To that question we think there can be but one answer. Under the imperative command of his employer, the deceased was on his way to relieve, in the capacity of a fireman, the crew of a train which was carrying interstate commerce, and the effect of his death was to hinder and delay the movement of that train.

In *Darr v. Railway Co.* (D. C.) 197 Fed. 665, the plaintiff was an employee in making what was called "running repairs," and was hurt while repairing the brake shoe of a locomotive tender or tank. A bolt had fallen out of the brake shoe on one of the wheels of the tender, and the brake beam hung down in dangerous proximity to the track. The plaintiff was directed to make the necessary repairs, and while engaged in doing so he was injured as the result of the negligence of a fellow employee in putting air on the brake, contrary to plaintiff's directions and unknown to him, and, as the defendant was engaged in interstate commerce, it was held liable.

In *Northern Pacific Ry. Co. v. Maerkle,* 198 Fed. 1 (117 C. C. A. 237), the deceased was injured by the negligence of the coemployee while putting a center sill under a refrigerator car, the car having been used a long time indiscriminately in intrastate and interstate commerce, and was to be continued

to be so used, and the Employers' Liability Act of Congress was held applicable.

These decisions have been cited with apparent approval by the Supreme Court of the United States in *Pedson v. Railway*, 229 U. S. 146 (33 Sup. Ct. 648, 57 L. Ed. 1125), where the plaintiff was an iron worker employed by the defendant in the alteration and repair of some of its bridges at or near Hoboken, N. J. He and another employee under the direction of their foreman were carrying from the tool car to a bridge some bolts or rivets which were to be used by them that night or early the next morning in repairing the bridge; the repair to consist in taking out an existing girder and in setting in one. The bridge could be reached only by passing through an intervening temporary bridge at James avenue. These bridges were being regularly used in intrastate and interstate commerce. While the plaintiff was carrying a sack of bolts or rivets over the James avenue bridge on the way to that to be repaired, he was run down and injured by an intrastate passenger train, of the approach of which the engineer failed to give him warning. With reference thereto, the court said:

Considering the terms of the statute, there can be no doubt that a right of recovery thereunder arises only where the injury is suffered while the carrier is engaged in interstate commerce and while the employee is employed by the carrier in such commerce; but it is not essential, where the casual negligence is that of a co-employee, that he also be employed in such commerce, for, if the other conditions be present, the statute gives a right of recovery for injury or death resulting from the negligence 'of any of the    . . . employees of such carrier,' and this includes an employee engaged in intrastate commerce. .  . . Was that work being done independently of the interstate commerce in which the defendant was engaged, or was it so closely connected therewith as to be a part of it? Was its performance a matter of indifference so far as that commerce was concerned, or was it in the nature of a duty resting upon the carrier? The answers are obvious. Tracks and bridges are as indispensable to interstate commerce by railroad as are engines and cars;

and sound economic reasons unite with settled rules of law in demanding that all of these instrumentalities be kept in repair.   The security, expedition, and efficiency of the commerce depends in large measure upon this being done.   Indeed, the statute now before us proceeds upon the theory that the carrier is charged with the duty of exercising appropriate care to prevent or correct 'any defect or insufficiency . . . in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment' used in interstate commerce.   But, independently of the statute, we are of opinion that the work of keeping such instrumentalities in a proper state of repair while thus used is so closely related to such commerce as to be in practice and in legal contemplation a part of it.  .  .  .   Of course, we are not here concerned with the construction of tracks, bridges, engines, or cars which have not as yet become instrumentalities in such commerce, but only with the work of maintaining them in proper condition after they have become such instrumentalities and during their use as such.   True, a track or bridge may be used in both interstate and intrastate commerce, but when it is so used it is none the less an instrumentality of the former; nor does its double use prevent the employment of those who are engaged in its repair or in keeping it in suitable condition for use from being an employment in interstate commerce.   The point is made that the plaintiff was not, at the time of his injury, engaged in removing the old girder and inserting the new one, but was merely carrying to the place, where that work was to be done, some of the materials to be used therein.   We think there is no merit in this.   It was necessary to the repair of the bridge that the materials be at hand, and the act of taking them there was a part of that work.   In other words, it was a minor task which was essentially a part of the larger one, as in the case when an engineer takes his engine from the roundhouse to the track on which are the cars he is to haul in interstate commerce.

In *S. L., F. & T. Co. v. Seale,* 229 U. S. 156 (33 Sup. Ct. 651, 57 L. Ed. 1129), the deceased was employed by the defendant as a yard clerk in its yards at North Sherman, Tex., and his principal duties were those of examining incoming and outgoing trains and making a record of the numbers and ini-

tials on the cars, of inspecting and making a record of the seals on the car doors, of checking the cars, supplying conductors with lists, and of putting cards or labels on the cars to guide switching crews in breaking up and making up outgoing trains. His duties were to both intrastate and interstate traffic, and at the time of his injury and death he was on the way through the yard to one of the tracks therein to meet an incoming freight train from Madill, Okla., composed of several cars, ten of which were loaded with freight. The purpose for which he was going to the train was that of taking the numbers of the cars and otherwise performing his duties in respect to them. While so engaged, he was struck and fatally injured by a switch engine which it was claimed was being negligently operated by other employees. In holding that defendant was liable, under the act of Congress, the court, speaking through Van Devanter, said: "In our opinion, the evidence does not admit of any other view than that the case made by it was within the federal statute. The train from Oklahoma was not only an interstate train but was engaged in the movement of interstate freight, and the duty which the deceased was performing was connected with that movement, not indirectly or remotely, but directly and immediately. The interstate transportation was not ended merely because that yard was a terminal for that train, nor even if the cars were not going to points beyond. Whether they were going further or were to stop at that station it still was necessary that the train be broken up and the cars taken to the appropriate tracks for making up outgoing trains or for unloading or delivering freight, and this was as much a part of the interstate transportation as was the movement across the state line." There the point that the injury was to the complainant while employed in interstate commerce was distinctly raised by special exceptions directing attention to the federal statute and suggesting that the state statute might not be applicable. Here the suggestion is by answer. There it was held that "the case pleaded was not

proved and the case proved was not pleaded," and that complainant was not entitled to recover on the case proved.

In the recent case of *North Carolina R. Co. v. Zachary,* found in 232 U. S. 248 (34 Sup. Ct. 305, 58 L. Ed. —), the fireman had oiled his engine and prepared it for a run between points within the state, and he then left it temporarily for his boarding house, and he was crossing a track and was killed by a backing switch engine, and, after holding that defendant was engaged in interstate commerce, the court proceeded:

It is argued that because, so far as appears, deceased had not previously participated in any movement of interstate freight, and the through cars had not as yet been attached to his engine, his employment in interstate commerce was still *in futuro.* It seems to us, however, that his acts in inspecting, oiling, firing, and preparing his engine for the trip to Selma were acts performed as a part of interstate commerce, and the circumstance that the interstate freight cars had not as yet been coupled up is legally insignificant. . . . Again, it is said that, because deceased had left his engine and was going to his boarding house, he was engaged upon a personal errand, and not upon the carrier's business. Assuming (what is not clear) that the evidence fairly tended to indicate the boarding house as his destination, it nevertheless also appears that deceased was shortly to depart upon his run, having just prepared his engine for the purpose, and that he had not gone beyond the limits of the railroad yard when he was struck. There is nothing to indicate that this brief visit to the boarding house was at all out of the ordinary, or was inconsistent with his duty to his employer. It seems to us clear that the man was still 'on duty' and employed in commerce, notwithstanding his temporary absence from the locomotive engine.

See, also, note to *Lamphere v. Railway,* 47 L. R. A. (N. S.) 38, in which all the cases bearing on this subject are collected.

In the light of these decisions, we reach the conclusion that the deceased was employed in interstate commerce at the time of receiving the injury. True, the engine had not been

attached to the train at the time, but it was being prepared for that purpose, and it was attached shortly thereafter and actually hauled freight into another state. It is suggested that the engine whose tender was being coaled was not shown to have been assigned to haul the particular train, and that the work may have been done generally, but we think any such inference was obviated by proof of the actual use made of it and the absence of evidence that engines were being so prepared generally without reference to when they were to be employed.

Appellee also argues that the tender filled by decedent was not conclusively identified as the one attached to the train. The number of the latter was 1968, and the employee author-

8. INTERSTATE COMMERCE: evidence.

ized to keep a record of each engine and tender supplied with coal testified that this was the number of that in connection with which deceased was killed. In the absence of any evidence to the contrary, the jury would not have been warranted in rejecting this identification as insufficient, even though the record were not adduced. We are inclined to the view that, under the decisions above, the deceased should be held to have been employed in interstate commerce, and that, as the evidence so showed conclusively, the court should have denied recovery under the laws of Missouri.

There is nothing in the suggestion that, in insisting that plaintiff elect which cause of action she would prosecute, defendant led her into error, for the ruling merely exacted that she determine on which statute, those of the state or of the United States, she would rely for a remedy, and necessarily the remedy to be applied depended on the determination of the issue as to whether decedent was employed in interstate commerce when struck by the falling apron.

Other rulings complained of are not likely to occur as now presented on another trial. The judgment is reversed, and the cause remanded, with direction that upon another trial, if the evidence is substantially the same, a verdict be

directed against plaintiff individually, and that the cause of action asserted by her as administrator of the estate of decedent be submitted to the jury under the Employers' Liability Act of Congress.—*Reversed.*

WEAVER, EVANS, and PRESTON, JJ., concur.