W. L. PELTON, Appellee, v. ILLINOIS CENTRAL RAILROAD COMPANY, Appellant.

**MASTER AND SERVANT: Employment of Servant—Sufficient Evidence of—Federal Employer's Liability Act.** An employment ''in interstate commerce'' is essential to the maintenance of an action under the Federal Employer's Liability Act. Evidence held sufficient to show that plaintiff was such employee, and not a mere passenger.

**MASTER AND SERVANT: Rules—Practical Construction of—Riding on Engine.** A rule forbidding any person to ride on an engine, except employees in the discharge of their duty, has no application to a head brakeman when such place was the customary place where the head brakeman rode, when he was directed by the conductor to ride on the engine, and such had been the practical construction of the rule.

**APPEAL AND ERROR: Inviting Instruction—Estoppel.** One inviting a certain action by the court must not complain if the court accepts the invitation.

PRINCIPLE APPLIED: Defendant pleaded a so-called ''assumption of risk,'' requested instruction thereon and one was given practically as asked. *Held,* court would not give ear to the

claim that the pleading added nothing to the general denial because it amounted to nothing more than a superfluous pleading of "assumption of risk naturally incident to the work, regardless of negligence."

**APPEAL AND ERROR:** Pleading—Specifications of Negligence— Proving Others. Whether the failure to prove defendant guilty of the particular negligence specified, but proving defendant guilty of another confessedly negligent act, *and the proximate cause of the injury,* presents such exceptional situation as to justify the affirmance of a verdict of recovery, *quaere.*

**APPEAL AND ERROR:** Verdict—Support in Evidence. A verdict on fair conflict of evidence will not be disturbed.

**APPEAL AND ERROR:** Instructions—Omission of Fully Established Issue. The failure to submit an issue fully determined and established by the evidence is not error.

PRINCIPLE APPLIED: In an action for personal injury under the Federal Employer's Liability Act, the court failed, in first stating the issues, to require the jury to find "that plaintiff, in order to recover, must show he was employed *in interstate commerce* at the time he was injured." In a later instruction the issue was submitted, but appellant claimed that this amounted to no more than an attempt to correct an erroneous instruction by contradicting it. *Held,* such omitted matter being fully established in the evidence, the court might have peremptorily instructed that the same was established, and therefore no prejudicial error occurred.

**DAMAGES:** Excessive Verdict—Personal Injury. Verdict of $20,000 reduced by trial court to $14,000 *held* not excessive under facts of instant case.

PRINCIPLE APPLIED: Plaintiff injured in jumping from engine in order to avoid collision. Trial over two years after accident. Plaintiff has a permanently stiffened knee, a curvature of the spine and some paralysis. Vertebrae of spine forced out of normal position, resulting in a pinching of the nerves. Unable to walk without crutches. Suffers from nervous disorders. Earning capacity wholly destroyed. Helpless condition is probably permanent. Prior to injury was earning from $100 to $145 per month.

*Appeal from Webster District Court.*—HON. R. M. WRIGHT, Judge.

SATURDAY, DECEMBER 19, 1914,

REHEARING DENIED WEDNESDAY, JUNE 30, 1915.

ACTION for damages for personal injuries to an alleged employee. There was a verdict and judgment for the plaintiff. Defendant appeals.—*Affirmed.*

*Kenyon, Kelleher & O'Connor* and *Price & Joyce,* for appellee.

*Helsell & Helsell,* for appellant.

EVANS, J.—1. Action was brought under the Federal Employer's Liability Act. The petition alleged that the plaintiff was a brakeman in the regular employment of the defendant railroad company, and that he was injured through the negligence of the company. It is also averred that the lefendant was then and there engaged in interstate commerce, and that the injury of the plaintiff was sustained "while he was employed by such carrier in such commerce." The answer was a general denial, and pleas of contributory negligence and assumption of risk.

One of the questions put forward by appellant is whether, at the time of the injury, the plaintiff himself was employed by the defendant in interstate commerce. And this depends upon the question whether, at the time of the injury, the plaintiff was employed in the operation of the train upon which he was riding, or whether he was riding thereon as a passenger to Fort Dodge, which was one of the terminals of his ordinary run as brakeman. The plaintiff was concededly an employee of the defendant, and had been for some years. He was engaged as head brakeman, and was one of a through freight crew. This train crew consisted of conductor Emory, head brakeman Pelton, and rear brakeman Fuhrman. The engine crew consisted of engineer Haviland and fireman Johnson. The above named generally worked

1. MASTER AND SERVANT: employment of servant: sufficient evidence of: Federal Employer's Liability Act.

together as one crew upon "through freight" trains. Their run was from Fort Dodge to Council Bluffs. The accident in question happened upon a passenger train and on November 20, 1911. The crew above named was in charge of that particular train, under special orders to that effect.

Whether such order included the plaintiff or imposed any duty upon him with reference to such train is one of the questions raised in argument, the defendant contending that there was insufficient evidence to support an affirmative finding on that question. The defendant concedes that that particular train was engaged in interstate commerce at the time. But it contends that the burden was upon the plaintiff to prove that he was engaged in such commerce; that is, that his employment related to the operation of that particular train at that time. Plaintiff's counsel concede that this burden is upon them, and contend that the evidence is abundant to support such burden. It appears from the evidence that the defendant's regular through passenger train, known as No. 2, was due to leave Council Bluffs for the east about 6 P. M. On the day in question, it was held for a brief time to await the arrival of a car over the Union Pacific Railroad, which car was occupied by a company of soldiers, destined for some eastern point. The delay in the arrival of such car over the Union Pacific was such that the defendant company sent on this passenger train No. 2 without waiting for it. At the same time, it ordered a special train to be made up, for the purpose of transporting the car of soldiers as soon as it should arrive. Such special train was run as section 2 of No. 2. It was deemed as a first-class passenger train, and entitled to the same rights and subject to the same regulations.

The natural inference from the record is that there was no regular train crew available for use upon this temporary train. Conductor Emory and his crew were in Council Bluffs, having brought in a through freight train the day before. The superintendent of the defendant company, through the train dispatcher, directed this crew to take such train from

Council Bluffs to Fort Dodge. There is no substantial dispute up to this point. It is the contention of the defendant, however, that such order of the superintendent did not contemplate the inclusion of the plaintiff as a member of the crew, because only one brakeman is included in a passenger train crew, and that the plaintiff, as head brakeman, was, therefore, unnecessary for the purpose of operating this train.

The testimony for the plaintiff tends to show that he was in fact called out as a member of the crew by the regular "caller," in the regular way, and assigned to this train as a member of such crew. Such call included both the engine crew and the train crew.

The plaintiff testified as follows:

"I was at my brother's residence at Council Bluffs at the time of the call. I was called by the call boy along about 6:30 for 7:30 P. M." Q. "What call boy?" A. "The caller for the Illinois Central. I didn't know the call boy only by sight. I had seen him before. I had been called by him." Judge Helsell: "Well, I don't remember whether there is anything more in that answer but I move to strike out from the answer that part of it which says 'call boy for the Illinois Central Railroad' as incompetent and the foundation not laid." (Motion denied. Defendant excepts.) A. "I wasn't given a specified time before the departure of that train. I proceeded from the passenger depot to the yard office and asked the yardmaster where my caboose was and he told me on the main line. I went to my caboose, took my lantern and lit it and went to the roundhouse, expecting to find my engine there. The engineer and fireman were already there and the engine ready to proceed to the depot. I threw the switch and let them out and gave them the signal to back up, which they did. I hadn't seen anyone in the meantime, nor received any instructions. I didn't see Mr. Emory. Mr. Fuhrman wasn't there when I left the depot. I rode on the engine to the depot, back to the yard office where we picked up the caboose.

It was standing on the main line and had been thrown out there by the switch engine, I suppose. We coupled on to it and backed to the passenger station. I coupled it myself. I rode back to the depot on the front end of the caboose. That was about 7:00 P. M. We then came to what we call the cross-over switch near the depot, and gave him a stop signal and cut off and lined the switch in through the cut-off so he could get in on the Union Pacific transfer, where I knew that the switch engine would back in on with the coach. That was to be put in ahead of our caboose. I knew about the tourist coach because I had been told of it by the yardmaster. The caboose was then cut off from the engine. I cut it off on one side of the cars and let him go ahead through the switch and put him on what they call the east main south track. I mean that I let him head down the track, that is, the engineer, W. J. Haviland. The fireman was C. O. Johnson. After they headed down there, I lined my main line switch back for the main line through there and threw my cut-off switch so when they came down the main line it would be in position for them to back up, when they came in from the cut-off. After that, I went back to the way car and changed my clothes. I found the rear brakeman, Mr. Fuhrman, there changing his clothes. I didn't see Emory at that time, it was about 7:40 before this tourist car was brought back there by the switch engine. When they came up, the Illinois Central switch engine, located at Council Bluffs, backed the coach in onto our caboose. Then next I lined Mr. Emory back so he could go out and get them started. I mean the cut-off switch. I then went up and talked to the rear brakeman. The switch engine went down in the yards. My engine was just over the crossing. They coupled the coach onto the way car. The caboose, coach, and engine, when they were all coupled together, were just a little north of the passenger station and they departed from that point. I saw Mr. Emory when he came out with the orders to give to the engineer. I didn't see the orders at all." Q. "What did Mr. Emory, if anything, say to you?" A. " 'Go

ride ahead.' That is an expression that is used in railroad parlance and means, to railroad men, to ride the engine. Mr. Emory was the conductor of that train. He gave the signal to go and I climbed upon the engine with the engineer and firemen. I had not examined these orders. We left Council Bluffs at 8:00 o'clock P. M. I rode on the engine up to the point of the collision." Q. "What were your duties on this train?" (Objected to, as sufficient foundation has not been laid and it calls for the conclusion and opinion of the witness, a matter that is one of the issues to be determined by the jury in the case.) A. "The customary duties are to take my engine from my train and to bring my engine from the roundhouse to the train." Senator Kenyon: Q. "Well I refer now to when the train was in operation, after leaving Council Bluffs." A. "Oh, take the head end, if necessary, in case of emergency. I paid attention to the train as we were running between Council Bluffs and Logan. I looked back to see if everything was all right, looked out of the cab window. I did that occasionally."

Conductor Emory testified as follows:

"Am now employed by the Illinois Central as a freight conductor. Have been such a conductor for 15 years. Before that time, I was a brakeman. My time is not entirely taken up with my work as a freight conductor. Sometimes I run passenger trains, sometimes freight. I have a certain number of brakeman in my crew. I have two brakemen, as a general rule. We go together; but when we are called upon from freight service to run a passenger train, we do not go together. Certainly not, if we run a regular run, but if we run an extra run we do. I am sometimes called as a conductor to take care of an extra passenger run. Running a second section of a train is the same thing as running a passenger train, except that the only difference is a freight crew is on it. When we are running an extra, sometimes we take our full crew and sometimes we don't. I remember the occa-

sion of the accident concerning which the evidence has been introduced here today. I was the conductor of second No. 2. I knew that I was to be conductor when I was called. I wouldn't say just when, we were called though, I think, at about 7:10. That is done by the call boy—sometimes he calls you by telephone. I think we were called by a telephone from the caller. I didn't get any instructions as to the calling of the crew, with reference to running the train. That wasn't my business—that was up to the terminal. They probably got their instructions from Fort Dodge.'' Q. ''Is it customary to call a man when he is not needed for the crew?'' A. ''Well, if they wanted to get the men here to run it back, they would probably call all the men. Sometimes they just dodge them around on this 16-hour proposition and they are liable to split a crew for something. It is up to the officers. We had no order to handle those men. Pelton and Fuhrman were called as the crew that night, besides myself. That was my crew. Pelton had been a brakeman, I should judge, 3 or 4 or 5 years, or something like that, and Fuhrman had been a brakeman about the same length of time. One of those men was a rear brakeman and the other a head brakeman. The duties of a rear brakeman would be to light his lights behind and take care of the caboose, etc. In case of a stop, he would look the train over and go out and flag, if it was necessary. If the train stops between stations in an emergency, the rear brakeman goes back and flags, that is a part of his duty, and the head brakeman goes forward and flags, if it is necessary. The necessity is determined sometimes by the conductor and sometimes by the engineer. As a general thing, the conductor has charge of the train and gives the orders with reference to it. The conductor has the general charge of the train going between stations on the Illinois Central Railroad. He gives the orders to the men on the train. This accident occurred on the 20th of November, 1911, the night I was conductor in charge of section 2. Mr. Pelton and Mr. Fuhrman were my brakemen. I received some orders at Council Bluffs.''

The superintendent of the defendant company, Downs, testified as follows:

"A freight crew consists of a conductor and two brakemen with a through freight. A conductor and three brakemen on a local freight. On some trains, a passenger train crew consists of a conductor and one brakeman and on some trains more. On some trains we have a porter. The crew that the second section of No. 2 from Council Bluffs to Fort Dodge had were, in the ordinary course, a freight crew but this night they were on a passenger train. There are regular and signed passenger crews. When one of those men lay off, or when new trains are put on temporarily or special train run, often a freight crew that has been running in freight service runs in the passenger service. Whether or not the whole crew goes to the passenger service, or just enough of the freight crew to make a crew, would depend on certain circumstances. If a freight crew consisting of a conductor and two brakemen arrived at Council Bluffs or Fort Dodge, and the superintendent or proper officials desired to run a second section of a passenger train with a freight crew, and assuming that one conductor and one brakeman would be sufficient for the passenger train, as to what would be done with the extra brakeman would depend upon circumstances. For instance, sometimes he might be used on that crew and, if there was some other services for him to be used for he might be in other services—freight services. Conditions are different. It just depends on the circumstances. The conductor is in charge of the train. He has authority over all members of the crew, but the engineer is equally responsible with the conductor so far as the running of the train, as it affects train rules and their rights; but eliminating the fireman and engineer. The rear brakeman reports to the conductor and the conductor has charge. If I wish to transfer a crew in Council Bluffs that had run down from Fort Dodge to the second section of a different run, we would change one conductor and

his crew to section No. 2. The chief dispatcher at Fort Dodge would issue a call to the yardmaster at Council Bluffs. His call would be an order that causes that crew to take charge of that certain train and take it back. He says to the yardmaster: 'That is the crew that I want on that train,' and the yardmaster carries out those instructions and sees that that crew is called and sees that they are placed in charge of that train and that the train is ready to go. Sometimes there is a record kept of those calls—I do not know whether the boys kept a record in Council Bluffs or not. Those calls are usually transmitted in this way: The chief train dispatcher would say to the yardmaster: 'I want W. S. Emory and his crew' and that is the last of it if Emory is there, and it doesn't need any record.''

The foregoing is a sufficient indication of the general nature of the testimony on behalf of plaintiff at this point. We think it is not only quite abundant to support an affirmative finding that the plaintiff was employed by the defendant at that particular time in the operation of such train, but also that it is quite conclusive on the question. He was, therefore, necessarily employed by the defendant in interstate commerce. *Armbruster v. C. R. I. & P. Ry. Co.,* 166 Iowa 155. The fact that only one brakeman is usually necessary for the operation of a passenger train, or that there was no pressing need for more than one brakeman for this particular train, is not a controlling fact. If the plaintiff was ordered by the directing officers of the corporation to the operation of this train as a member of Emory's crew, and if he boarded the train in obedience to such order, we see no room to claim that he was not employed in its operation, whether his duties thereon were many or few. That the defendant so regarded him is indicated by the further fact that it paid him for the run in precisely the same manner that it paid the other members of the crew. We hold, therefore, that the defendant was not entitled to a directed verdict on the ground here considered.

2. The plaintiff rode upon the engine. It is the contention of the appellant that this was done in violation of rule No. 728; that it was clearly contributory negligence, and that it amounted to an assumption of risk by plaintiff, because he knew and appreciated the danger in so riding. The rule in question was as follows:

2. MASTER AND SERVANT: rules: practical construction of: riding on engine.

"No person will be permitted to ride on an engine or in baggage, mail or express cars (except employees in discharge of their duties) without a written order from the superintendent."

The argument on this point is largely predicated upon the theory that the plaintiff was not employed in the operation of this train. It is also contended that even if he were so employed, he was prohibited by such rule from riding on the engine. It appears practically without dispute that this was the customary place for the head brakeman of a "through freight" to ride, and that this was the customary place where the plaintiff, as head brakeman, rode. He also testified that he was directed by the conductor to "ride ahead," which meant to ride upon the engine.

It is contended for plaintiff that he was an employee engaged in the discharge of his duties as such, and that the rule had no forbidding application to him. The language of the rule will certainly bear such construction. To our minds, it is the natural construction. The evidence also warrants the statement that such was the practical construction put upon the rule by the defendant and its employees. We think, therefore, that the rule in question presents no impediment to plaintiff's recovery.

This conclusion renders it unnecessary, also, to consider the many questions raised and argued relating to custom and waiver of rules.

3. Appellant complains of the instruction of the court on the subject of assumption of risk. The point made is that

the defendant pleaded no assumption of risk except that which

3. APPEAL AND ERROR: inviting instruction: estoppel.

inhered in the employment, and that such plea presented no issue of fact, and that the court therefore erred in submitting the question to the jury, as though an issue of fact were presented. The record in this respect presents a peculiar state. The third division of defendant's answer was as follows:

Further answering the defendant says: "That at the time of the accident and long before, the plaintiff was in·the employ of the defendant as a brakeman. That his duties were such as were usually incident to such employment upon a railroad train. That at the time of the accident, if engaged, as he claims he was, in the performance of any duty, it was connected with the running of a passenger train where he was familiar with any and all dangers connected therewith. That the accident happened at a time when it was bright moonlight and objects readily distinguishable. That in accepting said employment the plaintiff did so with the knowledge of the dangers naturally incident to his employment, and such other dangers as were obvious and patent, and that recognizing, knowing, and appreciating such dangers the plaintiff placed himself. voluntarily upon the engine where his duties did not demand him to be, and in a place where he knew and appreciated and where it was obvious and patent that the position assumed was the most dangerous place upon the train, and realizing, knowing and appreciating such dangers and the unusual danger connected therewith and the unnecessary danger connected therewith, he accepted such employment and assumed the risks that were natural and incident and obvious in said employment, and therefore waived any right to recover by reason of such continuance voluntarily in the employ of the defendant, and assumed all such risks connected therewith."

In stating the issues to the jury, the court stated this purported defense precisely as made in the answer. This was followed by instruction 18, as follows:

"A servant by entering or continuing in the employment of a master without complaint assumes the risks and dangers of the employment which he knows and appreciates and which an ordinarily prudent man would have known and appreciated if placed in his situation; but he does not assume those risks which are not necessarily incident to his employment and which he does not know or the dangers of which he does not appreciate. . . . Now, in this case, it is for you to determine from all the evidence in the case, whether or not plaintiff assumed the risk. If he did, he cannot recover in this case."

The argument for appellant is that it did not plead assumption of risk in its true sense, but that it pleaded only such assumption of risk as inhered in the contract of employment; that there was, therefore, no issue to be submitted. An examination of this division of defendant's answer, as above quoted, satisfies us that it pleaded no defense whatever, and that it could well have been ignored by the trial court. But the defendant is in no position to complain. Its answer purported to plead assumption of risk as a defense. If there was no intention to plead assumption of risk in its true sense, as a defense, there was no occasion for pleading it at all. *Duffey v. Consolidated Block Coal Co.*, 147 Iowa 225; *Martin v. Light Company*, 131 Iowa 724.

The defendant, however, did not confine its pleading to the assumption of risk incident merely to the contract of employment. It charged further that the plaintiff had assumed the obvious dangers and that he assumed the risk in question, because he knew and appreciated the danger to which he had exposed himself. It will be noted, by comparing the pleading with the instruction above quoted, that the trial court submitted the question to the jury precisely as the defendant pleaded it, and we see no room for complaint by the defendant.

There was another reference to the subject in instruction 7, wherein it was stated that the burden of proof as to assump-

tion of risk was upon the defendant. Appellant contends that this put a burden upon it upon a question not in issue. Whether the danger to which plaintiff was exposed was an obvious one, and whether it was one which he appreciated, was a question upon which the defendant's pleading tendered issue, and the defendant necessarily took the affirmative of the issue. The instruction of the court, therefore, upon this subject was invited by the defendant, and was consistent with defendant's pleading. Furthermore, the defendant requested an instruction upon the subject of assumption of risk, by presenting a requested instruction. We see no material difference between the instruction requested by the defendant and that given by the court, except that the requested instruction contained no reference to the burden of proof.

4. It is urged by appellant that the plaintiff wholly failed to prove the negligence specified in his petition, and that the trial court erred in refusing to direct a verdict for the defendant. The accident which resulted in

4. APPEAL AND ERROR: pleading: specifications of negligence: proving others.

plaintiff's injury was a head-end collision between the passenger train in question running east and a freight train running west. The accident occurred at about 8:40 P. M., three-fourths of a mile east of Logan. When the passenger train left Council Bluffs at about 8:00 P. M., its orders gave it a clear track to run without stop to Fort Dodge, one hour and twenty minutes late. A few minutes later, the train dispatcher gave an order to a west-bound freight train to meet the passenger train at Logan, and gave such freight train until 8:45 to clear the track. This order was never communicated to the passenger train crew. It could not be communicated except by signals. A proper signal was the display of a red light at Logan for the passenger train.

It is the contention of the defendant that such red light was displayed, and it is also contended that the testimony is conclusive to that effect. On the other hand, it is contended for plaintiff that a green light was displayed at Logan, and

not a red light.  The green light was a signal to proceed.
The specifications of negligence charged in the petition are
all grounded upon the failure of the defendant, through its
train dispatcher, to protect the passenger train against the
freight train, either by appropriate orders to the freight train
or by appropriate signals to the passenger train.  It is the
contention of the defendant that the testimony shows con-
clusively that the accident resulted from the negligence of
engineer Haviland on the passenger train in failing to observe
the red light, and in failing to see the headlight of the freight
train, which was observable for a distance of more than two
miles, upon a straight track.

The further contention is made that the plaintiff cannot
recover, notwithstanding the negligence of such engineer, be-
cause he did not specify such negligence of the engineer as
the ground of defendant's negligence.  A peculiar situation
is presented.  The defendant was confessedly negligent; and
yet it asks a reversal because it was not negligent in the
respect specified by the plaintiff's petition.

It is undoubtedly true that in order to recover, the
plaintiff must stand upon the specifications of negligence set
forth in his petition.  The purpose of requiring such specifica-
tion is not to spread a net to the plaintiff, but to enable the
defendant to know what evidence it has to meet.  The gist of
the action, nevertheless, is the negligence of the defendant in
whatever form, and not any particular specification.  The
specifications are amendable at any time pending the action.
If we were to find that the specifications of negligence pleaded
by the plaintiff were not proven, we would still be confronted
with the confession and contention of the defendant that,
though it was not negligent through its dispatcher, it was
negligent through its engineer, whose negligence caused the
accident.  The effect of a reversal would be to send the plain-
tiff back to prove the negligence of the defendant through its
engineer, a negligence already confessed in the record before
us.  The situation is exceptional, and it may well be doubted

whether a reversal and a new trial could be justified in such a case.

Turning to the evidence, however, both the plaintiff and Fuhrman, the other brakeman, testified that they observed the light which was displayed at Logan, and that it was the green light, and not the red light. How it appeared to the engineer can only be a matter of inference, because he was killed in the collision. On the other hand, testimony on behalf of the defendant was to the effect that the red light was displayed. Explanation is also offered on behalf of the defendant of a possible mistake by the witnesses for the plaintiff in that they had seen the green light of the Northwestern Railway which crosses at this point, and which admittedly displayed a green light at that time. All that concerns us now

5. Appeal and error: verdict: support in evidence. is that the testimony on behalf of plaintiff clearly tended to support his specifications of negligence. The trial court confined the jury to the consideration of the specific grounds of negligence charged. The question was, therefore, properly submitted, and the finding of the jury thereon is conclusive.

5. We have already considered the evidence on the question of whether the plaintiff received his injury while he was employed by the defendant in interstate commerce. The ap-

6. Appeal and error: instructions: omission of fully established issue. pellant complains that the trial court failed to submit this question to the jury; and that if it can be said to be submitted at all, it was so done by contradictory instructions. It must be conceded that the trial court lost sight of this element of the case in the first eleven instructions given. It was omitted from the statement of the issues. The sixth and seventh instructions given were as follows:

(6) "Therefore, gentlemen, for the plaintiff to recover in this action, he must establish by a preponderance of the evidence the following propositions, and if he fails to establish any one of them, he is not entitled to a verdict at your hands. Said propositions are: (1) That the train on which plaintiff was riding was at the time of the accident engaged

in interstate commerce.    (2) That the defendant did or omitted to do at least one of the things charged by him as constituting negligence.    (3) That in the doing or omitting to do this thing or these things, defendant was in fact guilty of negligence, as negligence is hereinafter defined.    (4) That the negligence of the defendant was the proximate cause (as proximate cause is hereinafter defined) of the injury of which the plaintiff complains.    (5) That he suffered some damages, and the amount thereof.''

(7) ''If the plaintiff has established by a preponderance of the evidence each of the foregoing five propositions, he will be entitled to your verdict unless the defendant has established by a preponderance of the evidence, the burden of proof being on it so to do, that the plaintiff assumed the risk, as the same is in these instructions hereinafter explained, of the dangers from which the injuries he received resulted. If the assumption of the risk has been so established by the defendant, the plaintiff cannot recover in this action.''

It will be noted that by these instructions the plaintiff was allowed to recover regardless of this element of his case. In instruction 12, however, the trial court defined interstate commerce.    Such instruction concluded as follows:

''But in order to bring himself within the protection of the law with regard to employees in interstate commerce, plaintiff must show by preponderance of the evidence that while riding on said train, he was an employee of the railway company, and was acting within the scope of his employment.''

The question then presented to us is whether the portion of instruction 12 here quoted sufficiently corrected the oversight of the preceding instructions, or was it a mere contradiction thereof?    As already indicated, the fact that plaintiff was employed in interstate commerce was established. Such a question is usually a mixed question of law and fact, and often one more of law than of fact.    The facts involved in such a question are usually simple.    When they appear

in the record without material dispute, it devolves upon the court to construe the federal act in its application thereto. So in this case, sufficient facts are undisputed to bring the case within the federal act. The jury, therefore, had nothing to do with the question. The court could properly have given a peremptory instruction thereon. The fact that it failed to do so and that in the twelfth instruction it submitted the question to the jury could not be prejudicial to the defendant. The finding of the jury could not have been more adverse to the defendant than the peremptory instruction would have been.

6. It is urged that the verdict was excessive. The verdict was for $20,000. It was reduced by the trial court to $14,000. It is urged upon us that this amount is still excessive. The injury was received on November 20, 1911.

7. DAMAGES: ex-
cessive verdict: The trial was had in April, 1913. The plain-
personal in-
jury.          tiff's injury was caused by his jumping from the engine when the collision was impending. It resulted in an injured knee and an injury to his spine. As a result, he has a permanently stiff knee. He has a curvature of the spine and some paralysis. The vertebræ of his spinal column have been forced out of their normal position so that they pinch the spinal cord and impinge upon the spinal nerves. He is unable to walk without crutches. He is suffering from serious nervous disorders as a result of injuries to his spine. His earning capacity is wholly destroyed. Prior to his injury, he was earning from $100 to $145 per month. His helpless condition is probably permanent. Upon this showing, we cannot say that the amount of the judgment is excessive.

7. Sixty-one errors are assigned. We cannot consider them all in detail. The foregoing comprise all the alleged errors which are dealt with in the brief and upon which the emphasis of the appeal is laid. We have considered all the errors alleged and find nothing prejudicial to the appellant.

The judgment below must be, therefore,—*Affirmed.*

LADD, C. J., WEAVER and PRESTON, JJ., concur.